556

ASSOCIATED GENERAL CONTRAC-
TORS OF NORTH DAKOTA (a non-
profit corporation), Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Laborers' International Union of North
America, Local No. 580, AFL–CIO;
Bricklayers, Masons and Plasterers In-
ternational Union of America, Local No.
4, AFL–CIO; United Brotherhood of
Carpenters and Joiners of America,
Local No. 1091, AFL–CIO; International
Association of Bridge, Structural and
Ornamental Iron Workers, Local No.
793, AFL–CIO; International Union of
Operating Engineers, Local No. 49,
AFL–CIO; and International Brother-
hood of Teamsters, Chauffeurs, Ware-
housemen & Helpers of America, Local
Nos. 74, 116, 123 and 581, Interve-
nors/Respondents.

LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA, LOCAL NO.
580, AFL–CIO; Bricklayers, Masons and
Plasterers International Union of Amer-
ica, Local No. 4, AFL–CIO; United
Brotherhood of Carpenters and Joiners
of America, Local No. 1091, AFL–CIO;
International Association of Bridge,
Structural and Ornamental Iron Work-
ers, Local No. 793, AFL–CIO; Interna-
tional Union of Operating Engineers,
Local No. 49, AFL–CIO; and Interna-
tional Brotherhood of Teamsters,
Chauffeurs, Warehousemen & Helpers
of America, Local Nos. 74, 116, 123 &
581, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Associated General Contractors of North
Dakota, Intervenor-Respondent.

Nos. 79–1851, 80–1012.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 10, 1980.

Decided Dec. 31, 1980.

Douglas R. Herman, Fargo, N. D., for petitioner/intervenor Associated General Contractors of North Dakota.

Robert D. Kurnick, Washington, D. C., for petitioners in No. 80–1012.

Eric Moskowitz, Atty., N. L. R. B., Washington, D. C., for respondent.

Before ROSS, Circuit Judge, GIBSON, Senior Circuit Judge, and STEPHENSON, Circuit Judge.

ROSS, Circuit Judge.

Two petitions for review of a decision and order of the National Labor Relations Board have been joined for our consideration. In an order dated September 25, 1979, the Board upheld and adopted Administrative Law Judge Donald R. Holley's conclusion that the Associated General Contractors of North Dakota ("AGC" or "the association") violated Section 8(a)(5) of the National Labor Relations Act [1] by bargaining to impasse over the inclusion of a "No-Conflicting Agreements" clause in their collective bargaining agreement with Carpenters Local 1091. The Board also adopted Judge Holley's conclusion that AGC did not violate Section 8(a)(1) of the Act by filing suit in state court to compel several local unions to honor the no-conflicting agreements clause or similar clauses in their respective agreements with AGC.[2] Both AGC and the unions petition this court to review the Board's decision and order.

In No. 79–1851, AGC, the respondent in the proceedings before the Board, petitions this court to set aside the Board's finding that AGC violated Section 8(a)(5) by bargaining to impasse over the no-conflicting agreements clause. In AGC's view, the clause is a mandatory subject of bargaining, which justifies the association's insistence on its inclusion in the bargaining agreement. The local unions, petitioners in the proceedings before the Board, have been allowed to intervene in No. 79–1851. In No. 80–1012, the local unions challenge the Board's conclusion that AGC's prosecution of a lawsuit in state court was not a tactic designed to interfere with, coerce or restrain employees in the exercise of their rights guaranteed in Section 7 of the Act, and therefore did not violate Section 8(a)(1) of the Act. In addition, the unions urge this court to hold, as the Administrative Law Judge did, that the no-conflicting agreements clause itself is unlawful. AGC has intervened in this action and the two petitions have been combined for our consideration.[3] For the reasons set forth below, we affirm the Board's Decision and Order of September 25, 1979.

The facts of this case are not disputed. AGC is a multi-employer bargaining association which represents employers who are in the building, heavy and highway construction industry in North Dakota. The charging parties consist of nine North Dakota local unions which have maintained contractual relations with AGC for several years. Although the contracts between the

---

1. 29 U.S.C. § 151 et seq.

2. The Board specifically refrained from adopting Judge Holley's finding that the no-conflicting agreements clause itself was unlawful, and reserved the issue for a tribunal of competent jurisdiction. In the Board's view, AGC's filing of the lawsuit in state court to enforce the

clauses is lawful even if the underlying clauses are not.

3. C. E. Lummas Co.—Kaiser Engineers, Inc. has filed an amicus curiae brief addressing the issue of the legality of the no-conflicting agreements clause.

separate unions and AGC vary, each contract contains a clause which affects the terms and conditions of any bargaining agreement that the local unions might negotiate with a non-AGC employer. Most of the clauses are referred to as no-conflicting agreements clauses, and are substantially the same in each contract:

(a) The employers agree not to enter into any agreement with their employees, covered by this agreement, which in any way conflicts with the terms and provisions of this agreement.

(b) The union agrees not to enter into any agreement with any individual employer or group of employers engaged in work classified as building construction within its jurisdictional area which conflicts or differs in any way with the provisions of this agreement.

The two separate agreements between AGC and Operating Engineers Local 49 contain what is referred to as a "Most Favored Nations" clause, which reads as follows:

The contractors agree not to enter into any agreement with their employees on whose behalf the union has been granted recognition hereunder, individually or collectively, which in any way conflicts with the terms and provisions of this agreement. The Union agrees not to enter into any agreement with any individual contractors or group of contractors competing in the same kind of work as herein specified, which provides for his, its, or their employees less favorable wages, hours and conditions, than as herein specified, without extending the same wage, hours and conditions to the contractors who are parties to this agreement.

While the no-conflicting agreements clause purports to prevent the union from entering into a collective bargaining agreement with another employer which "differs in any way" from the terms of the AGC agreement, the most favored nations clause allows the union to enter into different agreements with other employers so long as any conditions that are more favorable than those in the AGC agreement are offered to the association as well.

No conflicts arose over either of the two types of clauses until September 5, 1977. Prior to that date, Bechtel Power Corporation began work on the Coyote # 1 Project, a fossil fuel plant. Bechtel was not a member of AGC, but nevertheless Bechtel and its subcontractors originally abided by the provisions of the association's contracts. Subsequent to that date, however, Bechtel required its subcontractors to abide by the newly negotiated terms of what was referred to as the "Stabilization Agreement," which was entered into by and between the Bechtel Power Corporation, Lummus-Kaiser, and Stearn-Roger Incorporated, the Building and Construction Trades Department of the AFL–CIO, its affiliated International Unions, and the International Brotherhood of Teamsters and their affiliated local unions. The Stabilization Agreement contained material terms which differed from those of the contracts between the local unions and AGC.

Although none of the local unions were signatory to the Stabilization Agreement, their respective International Unions directed them to abide by the terms of the new agreement. In January of 1978, AGC filed suit in state court against the local unions to enjoin them from administering the terms of the Stabilization Agreement. The complaint alleged that the defendants had breached either the no-conflicting agreements clause or the most favored nations clause, as they appeared in the respective contracts with AGC.[4] The complaint was filed in the Fourth Judicial District of the North Dakota District Court, Burleigh County.

The North Dakota District Court dismissed the case on the grounds that AGC was not the real party in interest. The Supreme Court of North Dakota agreed

4. The Teamster locals were named in the complaint but no specific contractual breach was alleged as to any of these four locals.

with the district court's conclusion on appeal, and accordingly affirmed that portion of the district court's decision. *Associated General Contractors v. Local No. 580*, 278 N.W.2d 393 (N.D.1979). The case was remanded, however, to allow the substitution of a real party in interest. General Construction Company has been substituted as the plaintiff in that case, and it is now pending in the North Dakota District Court for Burleigh County.

## I.

We first turn to AGC's petition, which alleges that the Board erred as a matter of law in determining that the association violated Section 8(a)(5) by bargaining to impasse over the no-conflicting agreements clause in Carpenters Local 1091's contract. AGC has not argued that the Board erred in finding that an impasse was reached, and their brief indicates that the Board's factual conclusions are not challenged on appeal. The sole question before us on appeal, therefore, is whether the clause "so vitally affect[s] the 'terms and conditions'" of employment of bargaining unit employees that it is a mandatory subject of bargaining. *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178–82, 92 S.Ct. 383, 397–399, 30 L.Ed.2d 341 (1971). We hold that it does not.

At the outset, we note that the no-conflicting agreements clause does not directly affect the wages, hours and conditions of employment of the employees in AGC's bargaining unit. Instead, the no-conflicting agreements clause regulates the terms of bargaining between the local unions and *other* employers who are not members of the association. Therefore, the clauses are not themselves mandatory subjects of bargaining under the traditional standards set forth in *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). However, the Supreme Court has also recognized that matters involving individuals outside the scope of the immediate employment relationship can "so vitally affect the 'terms and conditions'" of employment for

bargaining unit employees that they become mandatory subjects for the bargaining unit. *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., supra*, 404 U.S. at 179, 92 S.Ct. 399. Nevertheless, for the reasons set forth below, we affirm the Board's conclusion in this case that the no-conflicting agreements clause "does not sufficiently affect the 'wages, hours and other terms and conditions of employment' between the Respondent and its employees in the bargaining unit."

As we have mentioned, the no-conflicting agreements clause represents an attempt on the part of AGC to restrict the terms of collective bargaining of parties outside its appropriate bargaining unit. This court and others have held that a party may not insist on bargaining for persons who are not in the appropriate bargaining unit. As this court stated in *General Drivers and Helpers Union, Local No. 554 v. Young and Hay Transp. Co.*, 522 F.2d 562, 566 (8th Cir. 1975),

> [a]lthough parties may voluntarily agree to merge separate bargaining units for purposes of contract negotiations so long as the resulting unit is an appropriate one, neither party may insist that negotiations must include other units and the other party is free to reject such a demand. *Minnesota Mining & Mfg. Co. v. N. L. R. B.*, 415 F.2d 174, 176–77 (8th Cir. 1969). If one party conditions all bargaining upon an acceptance of an enlarged bargaining unit, effective and lawful negotiations are blocked and the innocent party need not negotiate as long as the bargaining is forestalled by the illegal demand.

*See generally, Douds v. International Longshoremen's Ass'n*, 241 F.2d 278, 282–83 (2d Cir. 1957); *International Longshoremen's Ass'n v. NLRB*, 277 F.2d 681, 683 (D.C.Cir. 1960).

In addition, we find nothing in the record which supports AGC's argument that the no-conflicting agreement clause vitally affects the wages, hours and conditions of employment of the employees in the appropriate bargaining unit. AGC argues, for

example, that the clause is the linchpin of the collective bargaining agreement because every member of the local unions had an opportunity to vote on the contracts containing the clauses, and because the clauses have been approved by members of the unions for many years. We find no authority for such a novel argument. In fact, the Supreme Court in *Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., supra*, 404 U.S. at 176, 92 S.Ct. at 396, clearly held that a history or common practice of bargaining over certain issues, alone, cannot make those issues mandatory. AGC also contends that the clauses go hand-in-hand with mandatory subjects of bargaining such as nondiscriminatory union hiring halls or uniform wage rates, or that the clauses are a *quid pro quo* for such mandatory subjects. Because of this close relationship with mandatory subjects, it is argued that this court should therefore recognize the no-conflicting agreement clauses as being mandatory themselves. Under this theory, any term of a bargaining agreement could be transformed into a mandatory one if it was offered in exchange for a recognized mandatory subject. We decline to adopt such a position.

We have examined AGC's other arguments and find them to be without merit. Adoption of any of their theories would divert the court's attention from its proper task of determining whether the provision *vitally affects* the terms and conditions of bargaining unit employees. *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., supra*, 404 U.S. at 179, 92 S.Ct. at 397. Under this standard, we must agree that the no-conflicting agreements clause is a nonmandatory subject of bargaining, for it does not "*materially* or *significantly*" affect the terms or conditions of employment of the bargaining unit employees. *NLRB v. Local 264, Laborers' International Union*, 529 F.2d 778, 786 (8th Cir. 1976). *See also NLRB v. Davison*, 318 F.2d 550, 557 (4th Cir. 1963) ("[M]ost matters that might be discussed or proposed in collective bargaining are likely to bear some relation, even if tenuous, to 'wages, hours and other terms and conditions of employment.' But * * *

[n]ot all proposals that somehow respond to a problem that is customarily bargained about may themselves be insisted upon to impasse.").

## II.

■ In No. 80–1012, the local unions allege that the Board erred in holding that AGC's prosecution of a lawsuit in state court to enforce the terms of the no-conflicting agreements clauses did not violate Section 8(a)(1) of the Act. The local unions are joined by *amicus* Kaiser Engineers, Inc., in arguing that the clauses are unlawful, and the unions additionally assert that the filing of the lawsuit to enforce the illegal clause was an unfair labor practice. Although the Administrative Law Judge concluded that the clauses were unlawful, the Board expressly reserved judgment on that issue. However, the Board did adopt that portion of Judge Holley's opinion which held that the filing of the lawsuit was not an unfair labor practice, regardless of the legality of the underlying contractual claim. We enforce the Board's decision and order on both grounds.

For many years the Board has recognized that the filing of a civil lawsuit generally does not constitute a violation of Section 8(a)(1). In *Clyde Taylor Co.*, 127 N.L.R.B. 103, 109 (1960), where an employer obtained a state court injunction against a union's peaceful picketing as "part of a bad-faith scheme to defeat union organization," the Board concluded that it "should accommodate its enforcement of the Act to the right of all persons to litigate their claims in court, rather than condemn the exercise of such a right as an unfair labor practice." The *Clyde Taylor* decision has been widely followed in the last several years. *See Bergman v. NLRB*, 577 F.2d 100, 103 (9th Cir. 1977), and cases cited therein.

In *Retail Clerks, Local 770*, 218 N.L.R.B. 680, 89 L.R.R.M. 1407, 1410 (1975), the Board modified the *Clyde Taylor* doctrine. In that case, a union sued an employer to enforce an arbitration award. Although the contractual provision underlying the ar-

bitration award was specifically found unlawful, the Board upheld *Clyde Taylor's* legacy of accommodating parties' rights to litigate their claims in state court:

Since the Taylor case, the Board has consistently held that the filing of a civil suit cannot be found to be an unfair labor practice [citations omitted].

Relying on this case, we conclude that Respondent's conduct in resorting to the courts to confirm the arbitrator's award was done in good faith to enforce a colorable contract right and was not the kind of tactic calculated to restrain employees or employers in the exercise of rights guaranteed by the Act.

Although the labor violations were dismissed, the Board added a requirement of good faith for the enforcement of contract claims. This requirement was absent in *Clyde Taylor.* In addition, the court clearly stated that the filing of the lawsuit was not a labor violation because it was "not the kind of tactic calculated to restrain employees or employers in the exercise of rights guaranteed by the Act."

The local unions in this case claim that the exceptions to *Clyde Taylor* were broadened by the Board one year later in *Television Wisconsin*, 224 N.L.R.B. 722 (1976), and that the rationale of *Retail Clerks* was, in effect, superseded by the Board's holding in that case. Specifically, it is argued that, under *Television Wisconsin*, a civil lawsuit will be deemed an unfair labor practice if it has an "unlawful objective," regardless of the union's or employer's subjective intent in bringing it.

In *Television Wisconsin*, a union instituted a lawsuit against ten resigned members of the union in an attempt to enforce provisions of an expired contract relating to decertification activity and the crossing of picket lines. Although the lawsuit was found to have been brought in good faith, the Board upheld the Administrative Law Judge's finding of a violation of Section 8(b)(1)(A) because of the unlawful objective sought by the union in the enforcement of the expired contract:

We agree with the Administrative Law Judge's finding that the Union's action in filing a suit to enforce an unlawful unionsecurity clause violated Sec. 8(b)(1)(A) of the Act—*not because of the Union's subjective intent but because of the unlawful objective sought by the Union.*

*Television Wisconsin, supra*, 224 N.L.R.B. at 722 n.2 (emphasis supplied). Thus, the local unions in the present case insist that the "critical inquiry" in every case decided under *Clyde Taylor* since 1975 is whether there was an unlawful objective to the lawsuit in question, rather than whether the lawsuit was filed as a "tactic to restrain or coerce employees or employers in the exercise of rights under the Act," as suggested in *Retail Clerks, supra*, 218 N.L.R.B. 680, 89 L.R.R.M. at 1410.

We disagree with this reading of the case law. While we recognize that the requirement of good faith has been diminished by the Board's holding in *Television Wisconsin*, we do not believe that the requirement of looking into the union's or employer's purpose or motivation in the filing of a lawsuit has been abolished. In fact, the findings of the Administrative Law Judge which were adopted by the Board in *Television Wisconsin, supra*, 224 N.L.R.B. at 780, make it quite clear that the union's filing of the lawsuit in that case was a "tactic calculated to restrain or coerce employees or employers in the exercise of rights under the Act":

Since I have found that the Union's purpose was to enforce the unlawful unionsecurity clause and to restrain and coerce the defendants in the court action in the exercise of their rights to cross the picket line and file a decertification petition, I find that by filing the court action the Union violated Section 8(b)(1)(A) of the Act.

Similarly, in *Power Systems, Inc.*, 234 N.L.R.B. 99, 99 L.R.R.M. 1652, 1657 (1978), the Board cited *Retail Clerks* as authority for the proposition that

[s]ince Clyde Taylor, the Board has affirmed the principle that the filing of a civil lawsuit by an employer or labor organization is not a violation of the Act, *although in each such case the lawsuit was not a tactic calculated to restrain employees in the exercise of their rights under the Act.*

(Emphasis supplied.) However, the Board, citing *Television Wisconsin*, concluded that the employer had "no reasonable basis for filing the lawsuit," and thus inferred that the motivation for the lawsuit must have been the employer's unlawful objective of penalizing an employee for exercising rights guaranteed him under the Act. *Id.* The Seventh Circuit Court of Appeals subsequently set aside the finding because it was unsupported by the evidence in the record. In holding that the Board's inference of an unlawful objective could not stand, the court specifically looked to the evidence of the employer's motivation in filing the lawsuit:

> Nor is there any other basis in the record for the Board's finding as to Power Systems' motivation. The record in fact contains strong indications of a proper motivation on Power Systems' part and nothing to the contrary.

*Power Systems, Inc. v. NLRB*, 601 F.2d 936, 940 (7th Cir. 1979).

Finally, in *United Stanford Employees v. NLRB*, 601 F.2d 980, 982 (9th Cir. 1979), a labor union filed suit against non-members of the union to compel specific performance of their contractual duty to join the union. Although, as in the present case, the charging party claimed that the suit was merely a permissible effort to enforce a contractual obligation, the Board and the court of appeals concluded that the filing of the lawsuit was a violation because it restrained "the employees in the exercise of their 29 U.S.C. § 157 right not to join the Union." Unlike the present case, however, the court of appeals specifically found that "the specific-performance aspect of that lawsuit was *intended* to restrain employees' exercise of what was a 29 U.S.C. § 177 right not to become full-fledged Union members." *Id.* at 983 (emphasis supplied).

We thus conclude that the Board and the courts have not abandoned the inquiry proposed in *Retail Clerks, supra*, 89 L.R.R.M. at 1410, to determine whether the filing of the lawsuit in question is "the kind of tactic calculated to restrain employees or employers in the exercise of rights guaranteed by the Act." In our view, this is what is required in determining whether there is an "unlawful objective" in the filing of the lawsuit. Moreover, where, as in the present case, the Board has entered a finding that the filing of the lawsuit was not a tactic designed to interfere with the exercise of rights guaranteed by the Act, we must regard this factual finding as conclusive if it is supported by substantial evidence in the record. *Berbiglia, Inc. v. NLRB*, 602 F.2d 839, 842 (8th Cir. 1979).

We have reviewed the evidence in the record and have found that it supports the Board's findings. AGC's filing of the lawsuit therefore is not a violation of the Act. Since the filing of the lawsuit is not a violation of the Act regardless of the legality of the underlying contractual claim, we have concluded, as did the Board, that it is unnecessary to reach the question of whether or not the no-conflicting agreements clauses themselves are unlawful. Accordingly, the decision and order of the Board is hereby enforced in all respects. Each party shall pay its own costs.