**BILL JOHNSON'S RESTAURANTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 80–7266, 80–7348.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1981.

Decided Nov. 12, 1981.

As Modified on Denial of Rehearing and Rehearing En Banc March 2, 1982.

Lawrence Allen Katz, Streich, Lang, Weeks & Cardon, Phoenix, Ariz., for petitioner.

Candace Carroll, Atty., NLRB, Washington, D. C., argued, for respondent; W. Christian Schumann, Atty., Washington, D. C., on briefs.

Before GOODWIN and CANBY, Circuit Judges, and BYRNE,* District Judge.

CANBY, Circuit Judge:

On April 30, 1980, the National Labor Relations Board affirmed a ruling by an administrative law judge that appellant Bill Johnson's Restaurants had committed unfair labor practices by discharging a waitress, interrogating other employees, and by threatening reprisals against and filing and prosecuting a state court lawsuit against picketers who were protesting unfair labor practices. The Board ordered the restaurant to reinstate the discharged waitress, with back pay, to reinstate the three other waitresses who went on strike and to withdraw the lawsuit from state court. The restaurant seeks review of the Board's order under section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f). The Board cross-petitions for enforcement. We enforce the order of the Board.

## FACTS

The following facts were found by the administrative law judge and affirmed by the Board. In February 1972, Ruth Helton began working at Bill Johnson's Big Apple East, one of four restaurants owned and operated by Bill Johnson's Restaurants, Inc., in the Phoenix, Arizona, metropolitan area. The corporation is owned by the Johnson family. By summer 1978, Helton was one of the two most senior waitresses at the restaurant; since 1977 she had received an hourly bonus, and she served on the breakfast shift, which because of the hours and tips was the most desirable shift at the restaurant.

On July 25, 1978, Vice President Johnny Johnson called a meeting of employees to announce a new policy of strict enforcement of company rules. Among other things, Johnson told the waitresses that they must call in on days off, and that they could not chew gum while working or use the business phone for personal calls. Johnson ended by stating that any waitress who broke company rules would be fired. The next day, a waitress on the breakfast shift who had not attended the meeting asked her supervisor, Suzie Gay, what had happened. Gay answered, "Nothing pertaining to the breakfast girls." The breakfast waitresses, as the most senior employees, had traditionally been excepted from some company rules. For example, they were not required to call in on days off, and they had been allowed to use the business phone for personal calls.

In the days after the speech, the waitresses discussed it extensively. Several waitresses agreed with Helton's suggestion that they needed a union to represent them. Discussions of unionization were held in the waitresses' lounge, at a nearby hotel, at a party where Supervisor Gay was present for at least part of the discussion, and in the restaurant during a coffee break while Gay was nearby.

On August 8, Helton worked her regular shift and went home. That afternoon, Gay called her and told her that she was fired. Helton asked why, and Gay answered that Johnny Johnson had not liked a question she had asked at the July 25 meeting. (Helton had asked only whether waitresses could sell customers a single pancake or had to sell orders of two.) Gay said also that Johnson did not like Helton's attitude.

* Honorable William M. Byrne, United States District Judge for the Central District of California, sitting by designation.

Helton asked for a written explanation, but Gay said that the restaurant was not required to give her one. On August 9, Helton filed a charge with the NLRB.

The day after Helton's discharge, Dirkson, a hostess, told Gay that all the waitresses thought Helton had been treated unfairly. Gay said that she didn't like firing Helton, but that "Ruth had been antagonizing the girls on the floor" and that she couldn't "run a shift with that type of friction." She then asked whether Dirkson knew "if Ruth had any contact with any of the girls." A few days later, after learning that Helton had filed a charge with the NLRB, Gay asked Dirkson if any other waitresses had been talking about the union.

On September 18, waitresses Nichols, Scott, and Michaud walked out of the restaurant without explanation. On the way out, they turned their checkpads in to the cashier. The cashier reported their leaving to Manager Lois Williams. That afternoon, the waitresses returned to fill out their tip reports. Williams told them that they could pick up their checks the next day. When Manager Sherry Sturgeon asked the waitresses why they had walked out, they responded that they thought Helton was fired unjustly, and complained about the treatment they had received since the July 25 meeting. Sturgeon told the waitresses that they could forget what Johnny Johnson had said at the meeting because she was back in charge after her vacation. During the conversation, Scott stated that she was tired of waitressing. Nichols complained that her daily commute was too long. At no time did the waitresses say that they had quit their jobs, but Sturgeon told them to pick up their checks the following day.

On September 20, the Board issued a complaint against the restaurant, and the three waitresses joined Helton and a few others to picket the restaurant. Their picket signs said that the restaurant had been accused of unfair labor practices and asked the public to boycott the restaurant. The picketers walked along the sidewalk in front of the restaurant. Although they crossed two driveways which led to the restaurant parking lot, they did not block public access to the lots. At no time were there more than seven adults and two children picketing. That day, Sturgeon confronted the picketers and took down their names. She said, "You might think you're funny, but I intend to have the last laugh. I will get even with you for what you're doing." She told Helton that "I'll get even with you if it's the last thing I do." That afternoon, Gene Johnson telephoned waitress Cheryl Nichols and asked to talk with her husband. Johnson asked Carl Nichols why they had been picketing the restaurant. Carl said that they were protesting Helton's discharge. Then Johnson said that she would hate to see the Nichols lose their new home, and also that she would hate to see them "get hurt by all this."

On September 21 and 22, the picketing continued. On September 22, the picketers distributed a leaflet to the public. The leaflet stated:

THE [NLRB] HAS ISSUED A COMPLAINT AGAINST THE BIG APPLE RESTAURANT ... FOR UNFAIR LABOR PRACTICES.

The complaint was issued as a result of charges filed by [Ruth] Helton, a former employee who was fired August 8 after suggesting to other waitresses they should organize a union. Mrs. Helton had been an employee of the Big Apple seven and one half years.

Several other waitresses have quit their jobs to join Mrs. Helton in picketing the restaurant to inform the public of the dispute between the employees and the restaurant's management. Among the waitresses' complaints are the following:

* Eight hour shifts with no specified breaks.

* No pay for overtime when waitresses were required to remain at their posts until their last customer's check had been paid.

* Waitresses threatened with dismissal if they lost any time due to illness over the Christmas holiday season.

* Inconsistent management practices.

* Unwarranted sexual advances.

* A filthy restroom for women employees, with no soap, paper towels or toilet tissue provided.

EMPLOYEES OF BILL JOHNSON'S BIG APPLE FOR JUSTICE ON THE JOB.

On September 25, the restaurant filed a civil complaint in state court. The complaint alleged that the picketers had engaged in mass picketing, blocked public access to the restaurant, and created a threat to public safety. The complaint also alleged that the picketers had distributed a leaflet containing "false and outrageous statements, including misrepresentations of proceedings pending before the NLRB." The complaint sought actual damages, $500,000 in punitive damages, and an order enjoining the picketers from trespassing, mass picketing, violence, interfering with the restaurant's business operations, and publishing false and misleading statements about the restaurant and its management. That same day, the court issued a temporary restraining order granting most of the relief requested, and setting an October 5 hearing to consider the request for a preliminary injunction.

On September 26, the picketing continued, and Helton hired an attorney to represent her. On October 2, the restaurant's attorney deposed Helton, asking numerous questions about the nature and extent of Helton's union activities, the identities of other employees involved in union activities, and the extent of management's knowledge of these activities. On November 16, the state court denied the restaurant's request for a preliminary injunction. The suit for a permanent injunction and damages is still pending.

## HELTON'S DISCHARGE

■ The Board found that the restaurant had violated sections 8(a)(1) and 8(a)(3), 29 U.S.C. § 158(a)(1) and (a)(3), by discharging Helton for engaging in union activity. The Board ordered reinstatement and back pay. Under section 8(a)(3), the test is whether the union activity was the moving cause behind the employee's discharge. *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1341–42 (9th Cir. 1980). The determination of motive is particularly within the Board's area of expertise. *Pay'n Save Corp. v. NLRB*, 641 F.2d 697, 702 (9th Cir. 1981); *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 600 (9th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). An employer may not use a business reason as a pretext for a discharge which is motivated by anti-union animus. *L'Eggs Products, Inc. v. NLRB*, 619 F.2d at 1341. The Board need not credit an employer's self-serving statement that an employee was discharged for cause. *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d at 600. If the Board's findings and inferences are reasonable and supported by substantial evidence, they must be affirmed. *Pay'n Save Corp. v. NLRB*, 641 F.2d at 702; *NLRB v. Silver Spur Casino*, 623 F.2d 571, 585 (9th Cir. 1980), *cert. denied*, 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981).

■ In this case, the restaurant argues that it fired Helton for rules violations. The Board found that this reason was a pretext, and concluded that Helton was fired for engaging in union activity. This finding is supported by substantial evidence. Helton was a senior waitress, one of two waitresses who received a bonus. She had not previously been reprimanded for rules violations. Gay specifically told another breakfast waitress after the July 25 meeting that the rules did not apply to the breakfast shift, and none of the breakfast waitresses was required to call in on days off until Helton was fired. Other waitresses who broke the rules were reprimanded, not fired. The timing of Helton's discharge, the restaurant's leniency in enforcing rules violations of other waitresses, and the absence of reprimands on Helton's record all support the conclusion that she was fired for union activity. *See NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978).

■ The restaurant argues, however, that the evidence does not show that the restaurant management knew about Helton's union activities, and that without such knowledge, there can be no section 8(a)(3) violation. We conclude that there is substantial evidence to support the finding that the restaurant management knew about Helton's union activities. An employer's knowledge of union activity may be inferred from circumstantial evidence. *Famet, Inc. v. NLRB*, 490 F.2d 293, 295–96 (9th Cir. 1973). Because of the small number of employees who worked in the restaurant (40 waitresses total) and the close-knit, family management team, it is reasonable to infer that the management knew of Helton's efforts to organize a union. *Id.* After the July 25 meeting, the waitresses often discussed unionization in the restaurant. Their efforts at secrecy were minimal. At the August 3 party, Helton and another waitress discussed unionization in the presence of supervisor Gay. Later, after Helton was fired, Gay told Dirkson that Helton had been fired for creating friction among the waitresses, and asked whether Helton had contacted any other waitresses. The Board's conclusion that Helton was fired for union activity was a reasonable one, and supported by substantial evidence. We enforce the order of the Board on this issue.

### STATUS OF THE STRIKERS

■ The Board found that waitresses Nichols, Scott and Michaud struck to protest Helton's lawful discharge, and were therefore entitled to reinstatement. The restaurant argues that the waitresses did not strike, but quit their jobs. The Board found otherwise, and we conclude that its finding is supported by substantial evidence. The waitresses told manager Sturgeon that they had walked out of the restaurant because they objected to Helton's discharge and to management's treatment of the waitresses after the July 25 meeting. It was reasonable for the Board to conclude from this statement and the other evidence that the waitresses went on strike and picketed to protest the unlawful discharge of Helton. The failure of employees to present more specific demands to management at the time of their walkout does not prevent it from being a strike, within the scope of Section 7, 29 U.S.C. § 157. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14–15, 82 S.Ct. 1099, 1102–03, 8 L.Ed.2d 298 (1962); *Electromec Design & Development Co. v. NLRB*, 409 F.2d 631, 634 (9th Cir. 1969). It is true that during the conversation with Sturgeon, Scott said that she was tired of waitressing, and Nichols complained that her daily commute was too far. It is also true that the leaflets distributed by the picketers stated that the waitresses had quit their jobs in support of Helton. While different inferences may be drawn from the facts, however, the inferences drawn by the Board were reasonable and supported by substantial evidence. Once it was determined that the waitresses were striking to protest the unlawful discharge of Helton, they were entitled to reinstatement on the terms specified by the Board. *NLRB v. International Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972). We therefore enforce the order of the Board on this issue.

### THREATS AND INTERROGATION

■ The Board found that the restaurant had violated section 8(a)(1) by threatening and interrogating employees. An employer's interrogation of an employee violates section 8(a)(1) if, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employee in the exercise of his or her protected § 7 rights. *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d 721, 725 (9th Cir. 1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1080 (9th Cir. 1977). The test is whether the interrogation tends to be coercive, not whether the employee was in fact coerced. *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d at 725; *NLRB v. Anchorage Times Publishing Co.*, 637 F.2d 1359, 1364 (9th Cir. 1981). The Board found four instances of threats or interrogation which violated section 8(a)(1). These findings are supported by substantial evidence.

On the first day of picketing, manager Sturgeon threatened to get even with the picketers. That afternoon, president Gene Johnson told a picketer that she would hate to see him get hurt by all this. Both conversations involved threats which violated section 8(a)(1). On two occasions, supervisor Gay questioned Dirkson about union activities. On August 10, Gay told Dirkson that she had to fire Helton because Helton had been antagonizing the waitresses. Gay then asked whether any other waitresses had been contacted by Helton. A few days later, Gay again asked Dirkson whether any other waitresses had been talking about the union. Taken together, these two conversations clearly implied that a waitress involved in unionization would be fired. Therefore, these interrogations violated section 8(a)(1).

## THE STATE COURT SUIT

The Board found that the restaurant had violated sections 8(a)(1) and 8(a)(4) by filing and prosecuting the state court civil suit against the picketers. It is clear that "the mere filing of a lawsuit can restrain the exercise of [section 7] rights." *United Stanford Employees, Local 680 v. NLRB*, 601 F.2d 980, 983 (9th Cir. 1979). Before condemning a lawsuit as an unfair labor practice, however, the Board must be careful to make an accommodation between the rights of all persons to seek resolution of their legal claims in court and the rights of employees under the NLRA. *Clyde Taylor*, 127 N.L.R.B. 103, 109 (1960). The Board has adopted the rule that it is not an unfair labor practice for an employer to file and prosecute a civil lawsuit against an employee, so long as the suit is filed in good faith and not in furtherance of an unlawful objective. *See United Credit Bureau of*

*America, Inc. v. NLRB*, 643 F.2d 1017, 1023 (4th Cir. 1981); *Power Systems, Inc. v. NLRB*, 601 F.2d 936, 939 (7th Cir. 1979). Thus an employer who brings a good faith action against employees for mass picketing, and produces evidence making his claim a colorable one, is not guilty of an unfair labor practice simply because he ultimately loses the lawsuit on the merits. *Cf. Associated General Contractors v. NLRB*, 637 F.2d 556, 560–62 (8th Cir. 1980).

In this case, the restaurant's civil lawsuit had a lawful objective on its face; *i. e.*, the complaint sought relief for alleged wrongs that the state court could remedy. The Board found, however, that the restaurant lacked a reasonable basis in fact for the lawsuit, and concluded that the lawsuit was filed in bad faith to retaliate against the picketers. The Board found violations of both section 8(a)(1) and section 8(a)(4). Other courts have stated that the employer's anti-union motive is a key element of such violations. *See Associated General Contractors v. NLRB*, 637 F.2d at 561; *United Credit Bureau of America, Inc. v. NLRB*, 643 F.2d at 1024.[1] We conclude that there is substantial evidence in the record to support the Board's findings that the restaurant's lawsuit lacked a reasonable basis in fact, and that it was filed to penalize Helton for filing charges with the Board and to penalize the picketers for engaging in protected activity.

The restaurant produced no evidence to support its suit to enjoin the picketing. The allegations of mass picketing, trespass, and the resultant blocking of restaurant entrances and danger to the public were totally unsubstantiated. The state court did issue a temporary restraining order to limit the number of picketers and the man-

---

1. We question whether motive should necessarily play a part in determining whether an employer violates section 8(a)(1) by filing a lawsuit, without a reasonable basis in fact, against an employee. On its face, section 8(a)(1) does not require a showing of motive: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7.]" In contrast, section

8(a)(4) requires a showing that the employer's conduct was provoked by the employee's filing of charges with the Board. Motive is therefore a necessary element of a section 8(a)(4) violation. Because we uphold the Board's finding of improper motive, we need not reach the question whether section 8(a)(1) may be violated in the absence of such motivation. *See Ad Art, Inc. v. NLRB*, 645 F.2d 669, 678 n.10 (9th Cir. 1981).

ner of picketing. At no time, however, did the picketers number more than seven adults and two children who demonstrated peacefully on the sidewalk outside the restaurant. The mass picketing alleged in the complaint never materialized, and the preliminary injunction was later denied.

■ The restaurant also lacked a reasonable basis in fact for its libel suit. To prove libel in the context of a labor dispute, an employer must prove that the employees made false, defamatory statements, and that the statements were made with "actual malice," as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). *See Linn v. Plant Guard Workers*, 383 U.S. 53, 65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966). The statements contained in the leaflets were somewhat ambiguous; it was not made clear whether all the picketers' listed complaints (which the administrative law judge found to be factually true) had been made the subject of charges by the NLRB. The restaurant may therefore have believed that the leaflets falsely characterized the NLRB proceedings. But the very ambiguity of the leaflets in that regard tends to negate actual malice. In fact, the restaurant produced no evidence to show that the picketers 'made the statements with reckless disregard for the truth or falsity of the statements. Instead, the restaurant argues that its lawsuit had a reasonable basis because the complaint on its face was subject to state court jurisdiction. More than a carefully drawn complaint is required to avoid a finding that a lawsuit lacks a reasonable basis. *See United Credit Bureau of America, Inc. v. NLRB*, 643 F.2d at 1024–25.

■ The lack of a reasonable basis in fact for the lawsuit is some evidence that it was filed for an improper purpose. The Board's finding of an improper motive is supported by more than this reasonable inference, however. On the first day of picketing, manager Sturgeon confronted the picketers, and wrote down their names. She told them that she would "get even with you for what you're doing." She told Helton that she would "get even with you if it's the last thing I do." That afternoon, president Gene Johnson told a picketer that she would hate to see him "get hurt by all this." Five days later, the restaurant filed the lawsuit in state court. The restaurant almost immediately deposed Helton, and questioned her in depth about the identities of other pro-union employees. The deposition was conducted without the assurances against reprisal usually expected to accompany employer interrogation of employees.[2]

These circumstances, in the context of other unfair labor practices which the Board found, clearly permit a finding that the lawsuit was prompted by an improper motive. The immediate effect of this lawsuit upon Helton was to penalize her for filing an unfair labor practice charge with the Board. That motive and effect clearly produce a violation of section 8(a)(4). In addition, the lawsuit carried an implicit message to the other picketers: namely, that any persons who file charges against the restaurant or picket the restaurant will find themselves in court.[3] The violation of section 8(a)(1) is also clear. We conclude that substantial evidence supports the Board's finding that the lawsuit filed by the restaurant against Helton and the other

---

**2.** The Board found that the restaurant violated section 8(a)(1) by conducting this deposition. The deposition almost certainly had a chilling effect on Helton and the other picketers. It also tended to interfere with the Board's administration of federal labor policy by allowing the restaurant to circumvent the restrictive discovery rules which apply to unfair labor practice hearings. *See NLRB v. Maxwell*, 637 F.2d 698, 702–03 (9th Cir. 1981). Because we agree that filing and conducting the libel suit was an unfair labor practice, however, we do not con-

sider whether the deposition alone violated section 8(a)(1).

**3.** The chilling effect of a state lawsuit upon activity protected by the Act is multiplied when the state action, as here, seeks large damages. Employees whose picketing is the subject of a state suit for injunction may default and simply comply with the terms of the state injunction. They can hardly afford to fail to defend a claim for $500,000 damages. *See Linn v. Plant Guard Workers*, 383 U.S. 53, 64, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966).

**1344**

picketers violated sections 8(a)(1) and 8(a)(4). *See United Credit Bureau of America, Inc. v. NLRB*, 643 F.2d at 1025.

 Since the Board properly found that the filing of the state court action was an unfair labor practice, it follows that the Board can order the employer to cease and desist from that practice. The federal anti-injunction statute, 28 U.S.C. § 2283, does not prevent the Board from curbing state court action that interferes with the Board's exercise of its own jurisdiction. *Capital Service, Inc. v. NLRB*, 347 U.S. 501, 504–06, 74 S.Ct. 699, 701–03, 98 L.Ed. 887 (1954); *see also NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144–48, 92 S.Ct. 373, 377–79, 30 L.Ed.2d 328 (1971). Indeed, the Board's power to enforce the provisions of sections 8(a)(1) and 8(a)(4) would be largely crippled if it could not order the withdrawal of a retaliatory lawsuit.

 It is true that the regulatory scheme established by the National Labor Relations Act does not of itself preempt state court jurisdiction over actions for libel arising in a labor context. *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The Supreme Court has recognized the potential of such state suits for interference with federally protected rights, however, and has consequently ruled that all state libel actions are preempted unless they are based upon defamatory statements published with knowledge of their falsity or with reckless disregard of truth or falsity. *Id.* at 65. This carefully drawn boundary between legitimate state and federal interests would be hopelessly obscured if a libel action was automatically sustainable so long as the plaintiff carefully drafted its complaint to allege malice. The proper test of the legitimacy of the state action is whether the plaintiff has evidence to support its allegations of malice. *See United Credit Bureau of America, Inc. v. NLRB*, 643 F.2d at 2024–25.

 The state court, of course, is competent to determine whether an employer who brings a libel suit has evidence to support his allegations. The same deter-

mination, however, is one which the Board must make to decide whether filing the libel suit was an unfair labor practice. Since the Board has actually decided the issue, and the subject is central to the enforcement of federal labor policy, the Board's decision would appear to preempt further action by the state court. *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 209–10, 98 S.Ct. 1745, 1763–64, 56 L.Ed.2d 209 (1978) (Blackmun, J., concurring); *see San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244–245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Whether or not the state court's jurisdiction is technically preempted, however, the Board has the power to enjoin a state court lawsuit when the impropriety of that lawsuit is properly addressed and adjudicated by the Board.

 We recognize that this case involves a delicate balance between federal and state interests as well as between individual rights of organization and litigation. The Board has demonstrated its sensitivity to these issues by its sparing enforcement of limitations on the right to bring suit in state court. *See United Credit Bureau of America, Inc. v. NLRB*, 643 F.2d at 1022–23. In the present case the employer did not offer factual substantiation of its allegations of malice, and substantial evidence supported the Board's finding that the action was brought for retaliation and intimidation of employees in their organizational rights. In these circumstances, pursuit of the state action threatened the proper enforcement of the federal act and the Board was justified in putting a stop to it.

The Order of the Board is enforced in its entirety.