# ANJA ENGINEERING CORPORATION, Petitioner,

v.

# NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 81–7509, 81–7607.

United States Court of Appeals, Ninth Circuit.

Argued June 10, 1982.

Submitted June 17, 1982.

Decided Aug. 24, 1982.

Rehearing and Rehearing En Banc Denied Nov. 19, 1982.

Stuart H. Young, Jr., Hill, Farrer & Burrill, Los Angeles, Cal., for petitioner.

Corinna L. Metcalf, N. L. R. B., Washington, D. C., for respondent.

Before ANDERSON and FERGUSON, Circuit Judges, and CROCKER,* Senior District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Anja Engineering ("Anja" or "Company") petitions for review and to set aside an order of the National Labor Relations Board ("Board"), 256 N.L.R.B. No. 161, finding that Anja discriminatorily discharged employee Betty Hoffman in violation of sections 8(a)(1) and (3) of the National Labor Relations Act ("Act").[1] The Board cross-applies for enforcement of its order.

## I. FACTS

On May 21, 1979, the Southern California Printing and Paper Products Union ("Union") filed a petition with the Board for

certification as the exclusive representative of the production and maintenance employees of Anja. The election was held on August 31, 1979, where 100 votes were cast for the Union and 103 against.

Betty Hoffman, an Anja employee since November, 1973, was an active member of the Union's unsuccessful 1977 campaign for representation, serving on the Union's organizing committee. After the failure of the 1977 organization attempt, Hoffman served on Anja's health and safety, first aid, and Christmas committees. Hoffman apparently supported the Union's 1979 attempt at organizing the Anja employees by distributing authorization cards and advocating the organizing effort in the company's lunchroom. The parties dispute whether the company was aware of Hoffman's 1979 activities.

On May 18, 1979, Hoffman became ill with cancer and received permission for a leave of absence from Anja personnel supervisor Billie Scheidt. Scheidt filled out a leave authorization form, indicating that an expected return date would be approximately three months hence, or August 20, 1979. This form was not shown to Hoffman, nor was Hoffman instructed as to the alleged Anja automatic termination policy for indefinite leaves extending beyond 90 days, absent notice from the worker. While there is evidence that Anja was informally aware of Hoffman's medical care on a periodic basis extending into the month of August, 1979, Hoffman never formally notified the company prior to August 20, 1979, of her intent to return to work. According to the company, Hoffman was automatically discharged for her failure to notify the company of any intent to return.

On August 30, company officials and union business agents met to discuss the voter

* The Honorable M. D. Crocker, Senior United States District Judge, Eastern District of California, sitting by designation.

1. The Board's Decision and Order also found that Anja had committed unfair labor practices by dismissing four other employees, Rider,

Conrady, Crosmer and Bowser, and by notifying the employees of their duty to inform the company of any union harassment during the organizational campaign. These findings are not disputed by these petitions.

eligibility (Excelsior) list for the election the next day. At that meeting, the record indicates that company Vice President Moore notified the Union that Hoffman was no longer employed and was ineligible to vote in the forthcoming election. The Union disputed Hoffman's terminated status. The record indicates that Hoffman was formally notified of her discharge on August 30, 1979,[2] the day before the election, by telegram sent by Scheidt under the direction of Scripto official Sid Lanier. (Anja is a subsidiary of Scripto). On the day of the election, Hoffman appeared at the workplace and cast a challenged vote.

An ALJ found that Hoffman was discharged pursuant to a strict application of Anja's leave of absence policy and that Anja did not know of Hoffman's pro-union views prior to the 1979 election. ALJ Decision and Order at 18. Exceptions were filed with the Board, which reversed the ALJ on the Hoffman discharge issue, finding that Anja "has not credibily demonstrated that it would have fired Hoffman had she not been a union supporter." Board Decision and Order at 7. The Board also found, contrary to the findings of the ALJ, that Anja "had continuing knowledge that Hoffman was active on behalf of the Union and would almost certainly vote for union representation in the election; Board Decision and Order at 6," that Anja's leave of absence termination policy was "casually administered;" and that Hoffman was discharged "for the technical breach of an unwritten rule." Board Decision and Order at 10.

*Inter alia*, the Board ordered Hoffman reinstated and made whole for loss of earnings resulting from the unfair labor practices, set aside the August, 1979 election, and ordered a second election.[3]

2. The record is unclear as to the exact date upon which Hoffman actually received the termination telegram.

3. With reference to the undisputed findings, the Board ordered Anja to cease and desist from unfair labor practices or interfering with the

## II. DISCUSSION

### A. The Board's Finding of Discriminatory Discharge

#### 1. *Standard of Review*

■ We must enforce the Board's order if the Board's findings of fact are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Zurn Industries, Inc. v. NLRB*, 680 F.2d 683, 693 (9th Cir., 1982) (petition for rehearing and en banc suggestion pending). This standard of review does not change simply because the Board has disagreed with the findings of the administrative law judge, *NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978); however, "credibility resolutions of the ALJ are entitled to specific weight, and findings of the Board that are contrary to those credibility resolutions will be subjected to particularly critical scrutiny." *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924 (9th Cir. 1980). *See also Kallman v. NLRB*, 640 F.2d 1094, 1098, n.7 (9th Cir. 1981). Deference is to be given "to the reasonable derivative inferences drawn by the Board from credited evidence," *Big Bear Supermarkets*, 640 F.2d at 928; *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977); however, deference to the Board's conceded expertise does not mean that we will approve findings founded only in speculation. *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579, 581 (9th Cir. 1982).

#### 2. *Anja's Knowledge of Betty Hoffman's Union Views*

■ The central issue presented by this petition is whether substantial evidence supports the Board's finding, in the face of the ALJ's finding to the contrary, that Anja had knowledge that Betty Hoffman

employees' section 7 rights, and ordered Anja to make whole employees Crosmer, Conrady, Rider and Bowser. The parties dispute whether Anja may properly ask this court to review that part of the Board's order requiring a second election.

was a union adherent in 1979.[4] Crediting the testimony of Anja Vice-President Moore, the ALJ found that Anja had no knowledge of Betty Hoffman's activities in support of the union's 1979 organizational campaign.[5] The Board disregarded the ALJ's finding and found that the record was consistent with a theory that Anja had "continuing knowledge" of Hoffman's pro-union bent, first expressed during the 1977 organizational campaign.[6] This theory was based upon the Board's disagreement with the ALJ's finding regarding Moore's testimony, and founded upon the following other facts: (1) Anja's admission of knowledge of Hoffman's 1977 organizational activities; (2) that Anja had demonstrated anti-union animus in its discharge of other employees;[7] (3) that Anja vigorously resisted the Union's organizational efforts during the 1977 campaign; (4) that the timing of the discharge was a suspicious circumstance; and (5) that Scripto employee Sid Lanier was involved in the Hoffman termination decision, 256 NLRB No. 161, at 6–7.

■ With respect to Moore's testimony denying Anja's knowledge of Hoffman's union adherence in 1979, the Board argues, as it did in *Hartley*, that it did not discredit testimony found credible by the ALJ, but only inferred Anja's knowledge of Hoff-

man's pro-union stance by the adoption of different "derivative inferences" from credited testimony. We think otherwise. We must conclude here, as this court did in *Hartley*, that the Board's contrary conclusion of Anja's knowledge of Hoffman's pro-union views, of necessity, required discrediting Moore's testimony that he believed Hoffman's participation upon Anja's company committees demonstrated that she had become a company person. Logically, Anja's prior knowledge of Hoffman's views in favor of union representation cannot continue if Anja reasonably believed that Hoffman had changed her views. The Board's continuing knowledge theory, therefore, directly conflicts with the testimony of Moore, expressly credited by the ALJ.[8] We therefore must engage in a more searching review of the Board's findings to the contrary. *Hartley*, 669 F.2d at 581, *Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir., 1982).

■ Examined in this light, we cannot conclude that the record contains the substantial evidence necessary to support the Board's finding that Anja had knowledge of Betty Hoffman's pro-union stance during the 1979 organizational campaign. Although an employer's knowledge may be inferred from circumstantial evidence, *Bill*

---

4. A prima facie showing of wrongful discharge must consist of evidence showing (1) that Betty Hoffman was engaged in protected activity, and (2) that Anja had some knowledge of that activity at the time of the discharge. *See NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964). *See also NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714 (5th Cir. 1973); *Tri-State Truck Service v. NLRB*, 616 F.2d 65 (3d Cir. 1980); and *Indiana Gear Works v. NLRB*, 371 F.2d 273 (7th Cir. 1967).

5. The ALJ found:
   "While the General Counsel would argue that [Anja] was cognizant of Hoffman's union activity in 1977, and therefore that [Anja] would necessarily assume that Hoffman's prounion sympathies would continue, it is equally probable to conclude that as Vice President Moore testified, Hoffman's subsequent involvement in company-sponsored activities evidenced a contrary resolve on the part of Hoffman."
   ALJ Decision and Order at 18.

6. The Board found:
   ■

"Unlike the Administrative Law Judge, we find that Hoffman's participation on [Anja's] health and safety, first aid, and Christmas committees does not support [Anja's] inference that she had ceased to advocate union representation."
Board Decision and Order at 6.

7. *See* n.3, *supra*.

8. We must also agree with Anja that the Board's conduct here violates its own established policies. "[I]t is the Board's established policy not to overrule an administrative law judge's resolutions with respect to credibility unless the clear preponderance of all of the relevant evidence convinces us that the resolutions are incorrect." *Standard Dry Wall Products, Inc.*, 91 N.L.R.B. 544 (1950), *enfd*, 188 F.2d 362 (3d Cir. 1951). *See also Wright Line, a Division of Wright Line, Inc. and Bernard R. Lamoureux*, 251 N.L.R.B. 1083, n.1. As we make clear in this decision, such a preponderance of evidence is lacking on this record.

*Johnson's Restaurants, Inc. v. NLRB*, 660 F.2d 1335, 1340 (9th Cir. 1981); *Famet, Inc. v. NLRB*, 490 F.2d 293, 295–96 (9th Cir. 1973), and although the Board is not compelled to accept at face value the testimony of an employer concerning his motivations, *NLRB v. Warren Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978); in this case, the ALJ's contrary finding expressly based on Moore's credited testimony of Anja's lack of knowledge significantly detracts from the Board's continuing knowledge conclusion.[9]

Reviewing the Board's list of evidence in support of its conclusion of Anja's knowledge, we can find only speculation and conjecture bordering on cynicism. We do not attribute much weight to the fact that Anja vigorously resisted the Union's organizational efforts, or that Anja had been found to have harbored anti-union animus with respect to the discharge of three other employees on a prior occasion. Those facts do not directly support any particular inference that the company had any knowledge of Betty Hoffman's 1979 views or activities.

While the timing of a discharge can support an inference of the company's knowledge, *Bill Johnson's*, 660 F.2d at 1340; *Warren L. Rose Castings*, 587 F.2d at 1008, the value of such a fact is diminished by the ALJ's conclusion, based in substantial part upon credibility resolutions in favor of Anja, that Hoffman's discharge "was occasioned by a strict application of [Anja's] leave of absence policy, which ... was not discriminatorily applied to Hoffman." ALJ Decision and Order of January 13, 1981 at 18. Such a conclusion finds the timing of the discharge, under the circumstances of this case, to be of little significance in view of the fact that Hoffman was terminated for failing to timely return from her leave of absence regardless of the propinquity of the representational election. The Board's contrary conclusion, giving great weight to the timing, is, in our opinion, a cynical view of the record in support of the General Counsel's otherwise insubstantial showing of Anja's knowledge regarding Betty Hoffman's union views.

As for the Board's emphasis upon the alleged fact that Scripto employee Sid Lanier made the Hoffman termination decision, Lanier's testimony, apparently credited by the ALJ, is to the contrary. Lanier stated that any decision to terminate Hoffman was made only after consultation with company attorneys who advised Lanier that the company should terminate Hoffman for failure to return from her leave of absence in order to avoid an appearance that Anja might be discriminatorily applying its leave of absence policy. R.T. at 1057, 1059. Even if the Board's interpretation of the record were correct, i.e., that Lanier single-handedly terminated Hoffman, the additional speculative leap required to conclude that Anja management had knowledge of Hoffman's pro-union leanings in 1979 does not come easy. As noted in *Hartley*, deference to the Board's expertise is not required in support of findings founded only in speculation. 669 F.2d at 581.

Because the record lacks substantial evidence of Anja's knowledge of Hoffman's 1979 views on union representation, the Board's finding that General Counsel established a prima facie case of wrongful discharge consequently fails.[10]

9. "Our task in applying the substantial evidence test is not merely to look for evidence supporting the Board's finding, but to determine whether that evidence is substantial after taking into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 464; *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 877 (9th Cir. 1978)." *Tenorio v. NLRB*, 680 F.2d 598 at 601 (9th Cir., June 29, 1982).

10. The parties also dispute whether this court's approval of the Board's *Wright Line* test (from *Wright Line, a Division of Wright Line, Inc. v. NLRB*, 251 N.L.R.B. No. 150 (1980)) should be read as approval of the Board's burden shifting scheme accompanying such test. *See NLRB v. Nevis Industries, Inc.*, 647 F.2d 905 (9th Cir. 1981); *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579, 580–81 (9th Cir. 1982). Any uncertainty as to the burden shifted to an employer after the Board's proof of a prima facie case has been settled. *See Zurn Industries, Inc. v. NLRB*, 680 F.2d 683, (9th Cir. 1982).

In *Hartley*, this court denied enforcement of a Board order in a situation in which General

## B. Review of Board's Order Requiring Second Election

█ The Board asserts that the order requiring a second election is not properly reviewable by Anja's petition here because representation proceedings are reviewable only upon a charge that an employer's refusal to bargain with the certified union violates Section 8(a)(5) of the Act, citing to *NLRB v. Dick Seidler Enterprises*, 666 F.2d 383, 385, n.1 (9th Cir. 1982). We disagree.

The instant proceeding does not involve a union certification as a bargaining representative. Rather, this proceeding involves a review of a Board order finding a section 8(a)(3) violation, the very violation upon which the Board based its order directing a second election.[11] The Board's order, therefore, must fall with its unsupported finding of an unfair labor practice.

PETITION GRANTED; ENFORCEMENT DENIED.

FERGUSON, Circuit Judge, dissenting:

I dissent from the majority opinion.

The majority decision represents a significant and ill-advised break with the deference we have always given "to the reasonable derivative inferences drawn by the Board from credited evidence." *NLRB v. Big Bear Supermarket No. 3*, 640 F.2d 924 (1980). The standard of giving deference to the Board's inferences is based upon recognition of the Board's expertise in the field of labor relations. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977). *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The standard of review we have always applied when assessing the legitimacy of the Board's inferences is that we will uphold the Board's conclusions if they are supported by substantial evidence. *Los Angeles Marine Hardware Co. v. NLRB*, 602 F.2d 1302, 1305 (9th Cir. 1979). "This standard of review does not change merely because the Board reaches a conclusion contrary to that of the ALJ." *NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978). Obviously, we do not approve the Board's findings if they are only based on speculation. Substantial evidence means that there must be a solid basis for the Board's conclusions. But we should not lightly discard or disregard the Board's view of the facts of a labor dispute in favor of our own view of those facts. The Board is able to draw on its rich experience with innumerable labor disputes in forming its view of a single case. We are able to draw on only a much more limited experience.

*Doug Hartley, Inc. v. NLRB*, 669 F.2d 579 (9th Cir. 1982), the case on which the majority relies, is one in which the Board clearly overstepped its boundaries. In *Hartley*, the employees who were fired did not demonstrate even the minimal level of competence needed for the job. As the majority in *Hartley* points out, nothing in the NLRA has been or should be interpreted to prevent an employer from firing an incompetent employee. *See L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337 (9th Cir. 1980). Moreover, in *Hartley*, the firings did not take place in the midst of militant union activity.

In the case before us, on the other hand, the plant had been the target of continuing

---

Counsel proved a weak prima facie case, including a weak showing of the employer's knowledge about the employee's union activities, and that one of the employer's motivations was anti-union animus. This weak prima facie case was overcome by the employer's proof that the discharges would have occurred regardless of the protected activity. In this case, we think the ALJ was correct in concluding that no prima facie case was proven; therefore, we find even stronger reason to grant the petition here than existed in *Hartley*.

**11.** The Board's Decision reads:

"We have concluded that [Anja's] dismissal of Betty Hoffman on election day violated Section 8(a)(3) and (1) of the Act. [Anja's] illegal act occurred at its facility during the election process and was widely broadcast among the employees. Such conduct therefore clearly interfered with the conditions necessary to guarantee the employee's free choice of a representative in the election. Accordingly, we shall order that the election held on August 31, 1979, be set aside and a second election conducted."
256 N.L.R.B. No. 161, at 11–12.

union activity. The fired employee, Betty Hoffman, was openly involved in union activity from the time the union first came on the scene. The Board concluded that given Hoffman's open participation in union activities, and the company's admission that they knew she was involved in the 1977 organizing effort, it was reasonable to assume "a continuing knowledge" of Hoffman's union activities.

Likewise, the Board concluded that the timing of Hoffman's termination immediately before a union election—and the fact that Anja had militantly fought the union's efforts—made it likely that the termination was the result of Hoffman's union activity.

The ALJ rests his contrary decision on the testimony of Anja Vice President Moore, who stated that he did not know that Hoffman was a continuing activist and that the firing was nothing more than a routine termination in accordance with a well-established company rule. The majority does not deny that the Board is not compelled to accept at face value the testimony of an employer concerning his motivation. *NLRB v. Warren Rose Castings, Inc., supra,* 587 F.2d at 1008. Nevertheless, the majority rejects the Board's assessment of the situation at Anja as "cynical." While I can sympathize with the feeling that the Board's view of this case is cynical, I can just as easily imagine the majority's view being characterized as "benighted." Is the Board too cynical—or is the majority not cynical enough?

We should be careful to remember that the determination of what is "true" in the field of labor relations demands a careful judgment of a complex reality. The NLRA established a specialized administrative body to make that kind of careful evaluation. Our past deference to the Board has institutionalized the common-sense wisdom that those who have developed an expert knowledge in the area are the ones capable of making the most accurate assessment of the facts. Those of us who are far removed from the storm and stress of a militant union campaign should be extremely cautious in our assertions about the reality of labor-management relations.