SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL NO. 355, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

Nos. 81–7306, 81–7397.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1982.

Decided Sept. 26, 1983.

Collis Suzanne Stocking, Washington, D.C., for respondent, cross-petitioner.

David A. Rosenfeld, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for petitioner, cross-respondent.

Before FLETCHER, POOLE and CANBY, Circuit Judges.

FLETCHER, Circuit Judge:

This is an appeal from a decision and order of the National Labor Relations Board (Board) requiring Local 355 (Union) to compensate one of its members for losses suffered after the member had been discharged by his employer at the Union's request and enjoining the Union from further prosecuting a lawsuit in state court filed against the employee. 254 N.L.R.B. 773, 106 L.R.R.M. 1137 (1981). The Union seeks review under section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1976) (Act). The Board cross-petitions for enforcement. We enforce the order of the Board granting back pay but deny enforcement of that portion granting an injunction and reimbursement for legal expenses and remand with instructions.

## FACTS

David Gilson was employed at the Sacramento facility of Zinsco Products (Zinsco), which had a union shop agreement with the Union. Gilson fell behind in his union dues. Pursuant to the union shop agreement, the Union requested Zinsco to discharge Gilson unless he paid his back dues by February 9, 1979. Gilson was told that unless he paid the money he owed the Union by that date, Zinsco would discharge him.

The facts surrounding Gilson's payment of the back dues were in dispute before the administrative law judge. Gilson contended that the Union gave him an extension of time in which to pay the dues and that he paid them in accordance with the terms of the extension. The Union asserted that it gave Gilson no extension and that his payment was untimely.

The following facts were found by the administrative law judge (ALJ) and affirmed by the Board. On the afternoon of Thursday, February 8, 1979, after receiving his paycheck, Gilson telephoned Edgar Ingles, secretary-treasurer of the Union. Gilson identified himself, reminded Ingles that he was supposed to have his dues in by Friday, February 9, and asked whether Ingles wanted him to drive immediately to the Union's office in Oakland with the money or to mail it there instead. Gilson said that he doubted that the postal service would deliver the money by the next day. Ingles told Gilson to mail the money rather than deliver it personally and stated that he would talk with Gil Corvello, the Union's president, about the matter. Gilson stated that he did not want to jeopardize his job and asked whether Ingles was positive that it was all right for him to send the money by mail. Ingles told Gilson "not to worry about it, he would talk to Gil" and told Gilson, "go ahead and mail it in."

Gilson followed Ingles' instructions. On Thursday, February 8, immediately after talking with Ingles, Gilson purchased a money order for the amount he owed and mailed it to the Union's office. The Union

did not receive the money until Monday, February 12.

On the afternoon of Friday, February 9, Zinsco's production manager, David Kelly, telephoned the Union's office and asked to speak to President Corvello. The woman who answered the telephone said that Corvello was not there. Kelly asked whether she was familiar with Gilson's situation and whether the Union had received Gilson's dues payment. She stated that she was familiar with Gilson's situation and that the Union had not received any money from Gilson. Acceding to the Union's earlier request, the Company terminated Gilson on February 9 and hired a replacement, who began work the following Monday morning.

On March 8, 1979, Gilson filed an unfair labor practice charge with the Board alleging that the Union had violated section 8(b)(2) of the Act, 29 U.S.C. § 158(b)(2) (1976), by causing Zinsco wrongfully to terminate his employment. On April 27, the Board issued a complaint alleging that the Union had violated sections 8(b)(2) and 8(b)(1)(A) of the Act by causing Zinsco to discharge Gilson for failing to tender his dues "in the circumstances where [the Union had] granted Gilson an extension of time beyond the discharge date to pay said dues ... and where [the Union had] failed to notify [Zinsco] of said extension."

On May 21, 1979, the Union filed a civil suit against Gilson in state court. The complaint alleged that Gilson had failed to pay his dues on time, that he had "claim[ed]" that the Union gave him an oral extension of the time in which to pay his dues, and that he had "claim[ed]" that the Union thereby breached a duty it owed to him. The complaint further alleged that "[a]n actual and present controversy exists between the parties regarding the questions referred to above" and that "the Union had been damaged in the sum of $30,000 by [Gilson's] conduct." In addition to damages, the complaint sought "declaratory relief."

Prior to the hearing before the ALJ on the unfair labor practice complaint, the Union moved the Board for summary judgment and requested the Board to transfer the proceedings to itself and to issue an order to show cause why the motion should not be granted. The Board denied the Union's motion.

After the hearing, the ALJ found that the Union had violated sections 8(b)(2) and 8(b)(1)(A) of the Act by causing Gilson's discharge. The ALJ also found that the Union had violated section 8(b)(1)(A) of the Act by filing the state court suit against Gilson in retaliation for Gilson's filing of an unfair labor practice charge.

The ALJ ordered the Union to compensate Gilson for any loss of wages suffered by Gilson from the date of discharge through the date five days after the date on which the Union informed the employer that the Union no longer objected to Gilson's reinstatement. The ALJ also directed the Union to withdraw its state court suit and to reimburse Gilson for all legal expenses incurred in his defense. The Board affirmed the ALJ's order, but modified the back pay award to require the Union to compensate Gilson for all wages lost by reason of his discharge, including those wages accruing more than five days after the Union had requested reinstatement.

## DISCUSSION

### I. Denial of Summary Judgment.

The Union first contends that the Board erred in denying the Union's prehearing motion for summary judgment. The Union maintains that, under section 10(b) of the Act, unfair labor practice proceedings "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States," 29 U.S.C. § 160(b) (1976), including the summary judgment procedures set forth in Fed. R.Civ.P. 56. The Union does not assert, however, that the pleadings before the Board taken together with the Union's own affidavits did not raise any genuine issues of material fact in the sense of Rule 56(c). Rather, it argues that Rule 56 nonetheless

requires entry of summary judgment in the Union's favor because Rule 56(e) does not permit a party opposing a summary judgment motion to rest solely on the allegations contained in his pleading without producing any rebuttal affidavits.

■ We need not decide in this case whether Rule 56(e) is applicable in unfair labor practice proceedings. Even "[u]nder Rule 56 of the federal rules, a party against whom a motion for summary judgment is directed need not file any contravening affidavits or other materials but is entitled to a denial of the motion for summary judgment where the movant's papers are insufficient on their face or themselves demonstrate the existence of a material issue of fact." *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir.1976) (per curiam).

■ In this case, an affidavit signed by Union President Corvello, that was appended to the Union's summary judgment motion, states that on February 5, 1979, Corvello told Gilson "to send some money in by Friday, February 9." This averment was insufficient to resolve the central issue, whether the Union had told Gilson that he could mail his dues payment on Thursday rather than hand-deliver it to the Oakland office of the Union by Friday. One reasonable construction of Corvello's averment is that Corvello told Gilson to put his payment in the mail before Friday rather than to ensure its receipt by Friday. The affidavit of Ingles, that was also appended to the Union's motion, while stating that Ingles did not "in any way make any arrangements with [Gilson] different from what Corvello had left when he left town on February 6, 1979," similarly leaves material facts unresolved. The affidavit does not state what the arrangements were or that Ingles had personal knowledge of them. In short, the Union's own "supporting" affidavits were insufficient on their face to show that there was no genuine issue of material

fact. The Board did not err in denying the Union's motion.

II. *Securing Gilson's Discharge.*

The Union further contends that the Board erred in finding that the Union had violated section 8(b)(2) of the Act by securing Gilson's discharge without providing him "clear notice" of the means by which he could retain his job and in entering an order against the Union requiring the Union to compensate Gilson for wages lost from date of discharge until reinstatement by Zinsco. We reject both arguments and enforce the back pay portion of the Board's order in its entirety.

A. *Section 8(b)(2) Violation.*

■ Pursuant to a valid union security agreement, a union may cause an employer to discharge an employee who by nonpayment of dues fails to maintain union membership. 29 U.S.C. § 158(a)(3) (1976); *H.C. Macaulay Foundry Co. v. NLRB*, 553 F.2d 1198, 1201 (9th Cir.1977). The remedy for nonpayment of dues is a harsh one. When a union invokes it, "the [u]nion must deal fairly with the member." *Macaulay Foundry*, 553 F.2d at 1201. This fiduciary obligation requires the union, "at a minimum, [to] 'inform the employee of his obligations in order that the employee may take whatever action is necessary to protect his job tenure.'" *Id.* (quoting *NLRB v. Hotel, Motel and Club Employees' Union, Local 568*, 320 F.2d 254, 258 (3d Cir.1963)). Before the Union may "rightfully demand" an employer to discharge an employee, the union must give the employee "clear notice" of the steps that he is required to take in order to retain his job. *See General Teamsters Local 162 v. NLRB*, 568 F.2d 665, 669 (9th Cir.1978). The union's failure to give an employee "clear notice" of his dues-related obligations, where that failure results in the employee's discharge, is an "unfair labor practice" under section 8(b)(2) of the Act.[1] *Macaulay Foundry*, 553 F.2d at 1201.

---

1. Section 8(b)(2) of the Act states in pertinent part:

> It shall be an unfair labor practice for a labor organization or its agents

In light of these principles, we have no difficulty in upholding the Board's conclusion that the Union committed an unfair labor practice under section 8(b)(2) by causing Zinsco to discharge Gilson.[2] According to the Board's findings of fact, which are supported by substantial evidence in the record, the Union informed Gilson that it would not seek his discharge as long as he mailed his dues payment on the evening of Thursday, February 8, 1979. Ingles, an officer of the Union, specifically told Gilson that he need not deliver the payment in person that evening, as Gilson was prepared to do. Although Gilson complied with those instructions, the Union took no action to revoke its pending demand of Zinsco that Gilson be fired on February 9, 1979, unless the Union otherwise notified Zinsco.

Gilson's failure to inform his employer of the conversation between him and Ingles does not excuse the Union from liability. Having demanded that the employer discharge Gilson in the event that Gilson's payment was not received by Friday, February 9, the Union had a fiduciary obligation to give Gilson "clear notice" of the procedures he had to follow to retain his job. Before Gilson's telephone conversation with Ingles on February 8, Gilson had clear notice that the dues had to be received at the Union office by February 9. Since the conversation with Ingles indicated to Gilson that the requirement had been modified, the burden was on the Union to advise the employer that Gilson's mailing of the dues on Thursday, February 8, regardless of the date of the Union's receipt of the dues,

would comply with the Union security clause. *See Macaulay Foundry,* 553 F.2d at 1201 ("the Union must bear the responsibility for [the] ambiguity" in date by which dues had to be paid). By failing to do so, the Union rendered itself liable to Gilson for damages resulting from Gilson's discharge from Zinsco.

### B. *Change in Remedy for Unfair Labor Practice.*

To remedy the Union's commission of the unfair labor practice against Gilson, the ALJ ordered the Union to compensate Gilson for any wages lost as a result of Gilson's discharge for a period commencing with discharge but terminating five days after the Union asked the employer to reinstate Gilson. The Board modified the ALJ's order and held that the Union's back pay liability includes all lost wages suffered until Gilson is either reinstated by his former employer or employed in a substantially similar job. Contending that the Board's modification represents an improper departure from Board precedent, the Union asks us to deny enforcement of the Board's modification to the ALJ's back pay order. We reject the Union's argument.

The Board's prior remedy against the union in cases where the union had wrongfully caused an employee's discharge was to require back pay from the date of discharge to a date five days after the union indicated to the employer that it no longer opposed reinstatement. This rule was first established by the Board in *Pinkerton's National Detective Agency, Inc.,* 90 N.L.R.B. 205 (1950), *enf'd,* 202 F.2d 230 (9th Cir.1953).

---

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) [of section 8, regarding the propriety of discrimination against an employee by an employer] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership. . . .

29 U.S.C. § 158(b)(2) (1976).

**2.** Since we conclude that the Union's actions violated § 8(b)(2) of the Act, we need not ad-

dress the Board's holding that the Union's conduct was also a violation of § 8(b)(1)(A). *Compare Macaulay Foundry,* 553 F.2d at 1201 (9th Cir.) (finding improper securing of employee's discharge to be § 8(b)(2) violation, with no mention of § 8(b)(1)(A)) *with Hotel, Motel and Club Employees',* 320 F.2d at 255–258 (3d Cir.) (affirming Board's finding of § 8(b)(2) and § 8(b)(1)(A) violations for improper securing of employee's discharge, with no discussion of how union's conduct constitutes restraint of employee "in the exercise of the rights guaranteed in section 7" under § 8(b)(1)(A)).

In that case both the union and the employer were found to have committed unfair labor practices in discharging the employees. The Board ordered the employer to reinstate the discharged employees and held the employer and the union jointly and severally liable for the employees' lost wages. 90 N.L.R.B. at 213. The Board reasoned, however, that it would be inequitable to hold a union that had willingly ceased discriminating responsible for all lost wages where the employer refused to remedy its own unfair labor practices by promptly reinstating the employees. *Id.* Accordingly, the Board established the five-day tolling rule for the union and held only the employer liable for lost wages accruing after the date five days following the union request for reinstatement. *Id.*

Shortly after the Board's decision in *Pinkerton's,* the Board extended the *Pinkerton's* remedy rule to a case in which the union alone was found to have wrongfully caused the discharge. *Pen and Pencil Workers Union, Local 19593,* 91 N.L.R.B. 883 (1950). Since the employer was not a party in *Pen and Pencil Workers,* the Board was not able to hold the employer liable for damages or to order it to reinstate the employee. The Board stated that its objective in framing a remedial order in that case was "to require [the party] responsible for the discrimination to remedy such discrimination by restoring such employees, as closely as possible, to the employment and financial status they would have occupied if it had not been for the discrimination." *Id.* at 888. However, without further explanation, the Board limited the back pay order against the union to the period from the date of discharge to the date five days after the union notified the employer that it no longer objected to the employee's reinstatement, *id.* at 890, even though neither the Board nor the union had any capacity to require the employer to reinstate the employee. By so doing, it cast, perhaps unwittingly, upon the wrongfully discharged employee all remaining damages stemming from the unlawful discharge.

The Board acknowledges that since that time it has generally applied the *Pinker-ton's* tolling rule in cases where an employee is wrongfully discharged, regardless of whether the union is only partly or solely responsible for the discharge. *See, e.g., Macaulay Foundry,* 553 F.2d at 1202 (citing cases). *But see, e.g., Chauffeurs, Teamsters & Helpers Local 525,* 202 N.L.R.B. 572, 578 (1973) (remedy for union's securing of wrongful discharge of employee held to include all wages lost until the employer reinstated the employee or he found other substantially similar employment).

In the instant case, the Board concluded that the remedy applied in *Pen and Pencil Workers* is "inconsistent with the proper and effective realization of the statutory policy which requires that a transgressor should bear the burden of the consequences stemming from its illegal acts." The Board expressly overruled *Pen and Pencil Workers* and its progeny and held that the Union's liability for lost wages and benefits suffered by the employee includes all wages and benefits lost until the employee either is reinstated or obtains substantially equivalent employment elsewhere.

The Union argues that the Board acted outside its authority by applying a new rule against the Union for the first time in this proceeding. The Union contends that, because the Union may have relied on the tolling rule enunciated in *Pinkerton's* and *Pen and Pencil Workers* in deciding whether to commit the unfair labor practice, the Board should have established its new rule through the rulemaking procedures contained in the Administrative Procedure Act and not by adjudication. We disagree.

The broad scope of the Board's authority to fashion an appropriate remedy to alleviate the effects of unfair labor practices was set forth by the Supreme Court in *NLRB v. J.H. Rutter-Rex Manufacturing Co.:*

> We start with the broad command of Section 10(c) of the National Labor Relations Act ... that upon finding that an unfair labor practice has been committed, the Board shall order the violator "to take such affirmative action including reinstatement of employees with or without

backpay, as will effectuate the policies" of the Act. This court has stated that the remedial power of the Board is "a broad discretionary one, subject to limited judicial review." *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 216 [85 S.Ct. 398, 405, 13 L.Ed.2d 233] (1964).

396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969).

■■■ The decision whether to proceed by rulemaking or adjudication in the formulation of a remedial rule is within the agency's discretion.[3] *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *NLRB v. St. Francis Hospital of Lynwood,* 601 F.2d 404, 414 (9th Cir.1979). In particular, the Board may exercise its "discretionary power to mould remedies suited to practical needs" and to impose a new remedy for improper conduct in an adjudication before it even if the remedy imposed for the unlawful conduct is different from that imposed previously for similar conduct and even though no rulemaking procedure has been used to gain comments on or to provide notice of the new remedial approach. *See NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 351–52, 73 S.Ct. 287, 291–92, 97 L.Ed. 377 (1953) (upholding the Board's application of a back pay remedy different from that previously imposed in similar cases, despite no an-

nouncement of new remedial rule in rulemaking proceeding).

■■■ Although in some situations "the Board's reliance on adjudication would amount to an abuse of discretion," *Bell Aerospace,* 416 U.S. at 294, 94 S.Ct. at 1771, we do not believe that this is such a case. Unlike the recent cases in which this Circuit has found imposition of a new rule by adjudication rather than by rulemaking an abuse of discretion, the rule at issue in the instant case involves not an alteration of pre-existing lawful relationships (rendering unlawful that which had previously been lawful), but rather the imposition of a different remedy for conduct that has long been deemed improper.[4] *See Ford Motor Co. v. FTC,* 673 F.2d 1008, 1010 (9th Cir. 1981) (FTC's promulgation of new rule regarding motor vehicle resale and repossession practices through adjudicative proceedings held abuse of discretion, where new rule changed a standard of substantive liability, making illegal an industry practice that had previously been considered lawful); *Ruangswang v. INS,* 591 F.2d 39, 46 (9th Cir.1978) (INS's institution of new requirements for acquisition of exemption from requirement of labor certification through adjudicative proceedings held abuse of discretion); *Patel v. INS,* 638 F.2d 1199, 1205 (9th Cir.1980) (same); *see also NLRB v. Majestic Weaving Co., Inc.,* 355 F.2d 854, 860 (2d Cir.1966) ("decision brand-

---

3. Even if an agency acts within its discretion in imposing a new legal rule in an adjudicatory setting, the agency must, of course, provide a "reasoned explanation for any failure to adhere to its own precedents." *Hatch v. Fed. Energy Reg. Comm'n,* 654 F.2d 825, 834 (D.C.Cir.1981) (citing cases). Here, the Board fully complied with this requirement. The Board acknowledged that its ruling in the instant case was a departure from some of its previous adjudications, but provided reasons consistent with its statutory mandate for its change in course. As the Board noted, the five-day tolling rule inadequately serves the compensatory and regulatory purposes of a remedial order in cases in which the employer is not jointly liable for damages resulting from the unlawful discharge. In such cases, application of the tolling rule unfairly deprives the discharged employee of compensation for what may be a significant

portion of his or her lost wages and also gives improper incentives to labor organizations.

4. We note that the statute forbids absolutely the unfair labor practices enumerated in § 8 of the Act, including the § 8(b)(2) violation committed by the Union. Thus, we are not presented here with a situation in which a regulated individual's calculus of whether to perform certain proscribed conduct could properly include consideration of the size of the fine or penalty likely to be imposed if such conduct were performed. In such a situation, unlike the one reviewed here, a change in remedy in an adjudicatory as opposed to a rulemaking setting might constitute an abuse of discretion. *Cf. Bell Aerospace,* 416 U.S. at 295, 94 S.Ct. at 1772 (dictum) (change in legal rule by adjudication may be inappropriate in some instances where "fines or damages" are involved).

ing as 'unfair' conduct stamped 'fair' at the time a party acted, raises judicial hackles").

The Union also argues that even if the remedial rule espoused in *Pen and Pencil Workers* and its progeny could properly be changed by the Board in this case, the Board's order is invalid because Zinsco was not joined as a party and because the order does not require Zinsco to hire Gilson. We disagree.

The fact that Zinsco is not a party in the case does not preclude the Board from imposing a make-whole order on the Union. *See Radio Officer's Union v. NLRB,* 347 U.S. 17, 54–55, 74 S.Ct. 323, 343–344, 98 L.Ed. 455. The record nowhere indicates that any charge concerning Gilson's discharge was filed against Zinsco. Even if the Board had authority to order joinder of Zinsco, there is no evidence that Zinsco engaged in any conduct that would justify the Board in ordering it to reinstate Gilson.[5] The Union's fear of back pay liability "continu[ing] unabated, forever" in the absence of a reinstatement order directed at the employer is exaggerated. Under the Board's order, the Union can terminate its back pay liability at any time by finding Gilson a substantially equivalent job.

In short, we conclude that the back pay portion of the Board's order is both calculated to effectuate the policies of the Act and appropriate to the circumstances of this case.

### III. *Retaliatory Lawsuit.*

The Board found that the Union had violated section 8(b)(1)(A) of the Act by filing its state court suit for $30,000 in damages against Gilson in retaliation for Gilson's filing of a charge before the Board. It ordered the Union to withdraw the suit and to reimburse Gilson for any legal expenses incurred in defending himself in the state court action.

The Union asserts on appeal that, for any one of several distinct reasons, we must deny enforcement of this portion of the Board's order. While we find that none of the Union's arguments compel the result it urges, we nonetheless deny enforcement of the injunction portion of the order on the authority of *Bill Johnson's Restaurants, Inc. v. NLRB,* —— U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), a case decided after submission of this case, and remand to the Board for further proceedings.

The Union argues first that, regardless of the effects of or motivations behind the lawsuit, its filing could not be an unfair labor practice since retaliation against the filing of an unfair labor practice charge before the Board is not specifically enumerated in the Act as an unfair labor practice. We disagree.

Section 8(a) of the Act, which enumerates acts that are "unfair labor practices" when committed by *employers,* in its subsection 4 defines such practices to include "discrimin[ation] against an employee because he has filed charges ... under this subchapter." 29 U.S.C. § 158(a)(4) (1976). Section 8(b), which covers unfair labor practices by labor organizations, does not include a counterpart. The lack of a definitional provision in section 8(b) directly comparable to that contained in section 8(a) does not, however, compel the result the Union urges.[6]

5. An employer violates the Act by discharging an employee at the request of the union only when it has "reasonable grounds for believing" that the request is unlawful. *Macaulay Foundry,* 553 F.2d at 1201.

6. A provision somewhat similar to § 8(a)(4) of the Act was contained in the version of the Taft-Hartley Act that passed the House in 1947 but was deleted by the conferees and omitted from the Act. We do not find this bit of history particularly significant. The "legislators may have thought that the proposal was worded too broadly and abandoned it for that reason" or may have thought that § 8(b)(1) already covered the ground. *Roberts v. NLRB,* 350 F.2d 427, 428 & n. 1 (D.C.Cir.1965). *But see NLRB v. Industrial Union of Marine & Shipbuilding Workers of Am.,* 379 F.2d 702, 707 (3d Cir. 1967) ("neither the board nor a court can properly employ its views of public policy as justification for engrafting upon section 7 a general right of unlimited access to the Board, the declaration of which the Congress considered but chose to withhold"), *rev'd on other grounds,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

Such union conduct nonetheless falls within the more general language of section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A) (1976), that defines an "unfair labor practice" committed by a union to include restraint or coercion of an employee in the exercise of the employee's rights guaranteed under section 7 of the Act.[7]

■ The Act does not explicitly state that the exercise of protected section 7 rights includes bringing a charge of an unfair labor practice before the Board. Nonetheless, a union commits a section 8(b)(1)(A) unfair labor practice when it restrains or coerces an employee who has filed a charge with the Board alleging that "the union has in some way interfered with the sort of activity that is described in" section 7. *Philadelphia Moving Picture Machine Operators' Union, Local No. 307 v. NLRB,* 382 F.2d 598, 600 (3d Cir.1967); *see NLRB v. Industrial Union of Marine & Shipbuilding Workers of America,* 379 F.2d 702, 706–07 (3d Cir.1967), *rev'd on other grounds,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *NLRB v. Local 294, International Brotherhood of Teamsters,* 470 F.2d 57, 60, 62 (2d Cir.1972).

■ In this case, Gilson initially filed with the Board a section 8(b)(2) charge, not an 8(b)(1)(A) charge. Although arguably he did not allege the Union's interference with concerted activity protected by section 7, the Board nevertheless found Gilson's filing protected activity under section 8(b)(1)(A). We agree.

■ The ability of an employee to air fully before the Board a charge of an unfair labor practice has been recognized as crucial in effectuating the purposes of the Act, both to deter and remedy the commission of unfair labor practices and to ensure "the functioning of the Act as an organic whole." *Bill Johnson's Restaurants, Inc. v. NLRB,* 103 S.Ct. at 2168 ("rights secured by § 7 of the Act" to employees "includ[e] . . . the right to utilize the Board's processes"); *NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 424, 428, 88 S.Ct. 1717, 1721, 1724, 20 L.Ed.2d 706 (1968) (because "[a]ny coercion used to discourage, retard, or defeat . . . access [to the Board for relief] is beyond the legitimate interests of a labor organization"); *Nash v. Florida Industrial Commission,* 389 U.S. 235, 238–39, 88 S.Ct. 362, 365–66, 19 L.Ed.2d 438 (1967) ("Congress has made it clear that it wishes all persons with information about [unfair labor] practices to be completely free from coercion [by employers and unions] against reporting them to the Board."); *Local 294, International Brotherhood of Teamsters,* 470 F.2d at 62 (charges of unfair labor practices are filed and adjudicated before the Board not to vindicate private rights but to " 'give effect to the public policy as defined by Congress, viz: the prevention of unfair labor practices which by causing and increasing industrial strife, obstruct the free flow of interstate commerce' ") (quoting *NLRB v. General Motors Corp.,* 116 F.2d 306, 312 (7th Cir. 1940)).[8] These policy considerations favor

---

**7.** Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A) (1976), states:

It shall be an unfair labor practice for a labor organization or its agents . . . to restrain or coerce . . . employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . .

Section 7 of the Act, 29 U.S.C. § 157 (1976), states:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8(a)(3) of the Act].

**8.** *Cf. United Credit Bureau of Am. v. NLRB,* 643 F.2d 1017, 1024 (4th Cir.1981) ("successful implementation of the Act requires that complete protection be given persons who, in good faith, file charge or testify"); *Power Systems, Inc.,* 239 N.L.R.B. 445, 449 (1978) (penalizing employee for filing a charge with the Board,

keeping the Board freely accessible to Union members in all cases. The fact that an employee's original charge filed with the Board, like Gilson's, does not by its terms allege interference with section 7 rights is not fatal. Such a violation may nonetheless be recognized and addressed by the Board when discovered during the course of its investigation. *See NLRB v. Fant Milling Co.*, 360 U.S. 301, 306–09, 79 S.Ct. 1179, 1182–84, 3 L.Ed.2d 1243 (1959).

■ Similarly, even if an employee's charge of interference with section 7 rights ultimately proves unfounded, such a charge is indistinguishable on its face from a meritorious one. In order to keep the processes of the Board open for protection of employees whose section 7 rights are actually infringed by Union conduct, it is important that an employee not be restrained in bringing a charge of any unfair labor practice before the Board, whatever its verbal content and regardless of whether the Board ultimately determines that the union conduct alleged in the charge constitutes interference with section 7 rights. Consequently, we conclude that section 8(b)(1)(A) of the Act affords protection not only to an employee's direct exercise of the substantive rights actually described in section 7, but also to his filing of a charge of any section 8(b) unfair labor practice before the Board. *Roberts v. NLRB*, 350 F.2d 427, 428

(D.C.Cir.1965) ("the right of an employee to file [any unfair labor practice charge] is protected under Section 7"); *NLRB v. International Union of Operating Engineers, Local 925*, 460 F.2d 589, 592 n. 1 (5th Cir. 1972); *NLRB v. International Union of Operating Engineers, Local 825*, 420 F.2d 961, 961 (3d Cir.1970); *Chauffeurs, Local 525*, 202 N.L.R.B. 572, 577 (1973); *Local 138, International Union of Operating Engineers*, 148 N.L.R.B. 679, 682 (1964).[9]

The Union further argues that, even if a union's restraint of or retaliation against an employee who files a charge before the Board ordinarily is an unfair labor practice under section 8(b)(1)(A), the filing of a suit in state court cannot possibly constitute such restraint or retaliation.[10] We reject the argument.

■ The Supreme Court has held that "it is an enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by § 7 of the NLRA." *Bill Johnson's Restaurants, Inc. v. NLRB*, 103 S.Ct. at 2171. Consequently, where a union, acting in bad faith, files a baseless civil lawsuit against an employee that tends to restrain or retaliate against an employee's filing of a charge of an unfair labor practice before the Board, the union commits an unfair labor practice under section 8(b)(1)(A).[11]

and thus, depriving him of, and discouraging employees from seeking, access to the Board's process is unlawful object of employer's lawsuit), *enf't denied on other grounds*, 601 F.2d 936, 940 (7th Cir.1979).

**9.** *See Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. at 422, 88 S.Ct. at 1720 (1968) (filing of unfair labor practice charge constitutes "exercise of rights guaranteed by section 7" within meaning of section 8(b)(1)(A) at least where charge alleges "an impairment of § 7 rights"); *Nash*, 389 U.S. at 238–39, 88 S.Ct. at 365–66 (1967) (dictum) (the Act forbids unions to take "coercive actions" against persons making charges); *cf. Bill Johnson's Restaurants, Inc. v. NLRB*, 103 S.Ct. 2161, 2168 (1983) ("rights secured by § 7 of the Act ... includ[e] ... the right to utilize the Board's processes—without fear of restraint, coercion, discrimination, or interference from [the] employer"). *Contra Industrial Union of Marine &*

*Shipbuilding Workers of Am.*, 379 F.2d at 706–07 (3d Cir.1967) (dictum) (filing of charge before Board constitutes section 8(b)(1)(A) unfair labor practice *only* where charge "asserts misconduct which, if proved, would constitute a deprivation of rights declared in [section 7]"), *rev'd on other grounds*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

**10.** Since the Union does not contend on appeal that the state court suit involves merely the "plainly internal affairs of the union," we need not consider whether the Union's suit is excepted by the proviso to § 8(b)(1)(A). *See Industrial Marine and Shipbuilding Workers*, 391 U.S. at 424, 88 S.Ct. at 1721 ("§ 8(b)(1)(A) assures a union freedom of self-regulation where its legitimate internal affairs are concerned").

**11.** The term "in bad faith" refers to the improper subjective motivation of a union for performing the questioned conduct. A union acts

The Union contends that the filing of the suit against Gilson does not constitute an unfair labor practice both because there is no restraint against the employee and because the lawsuit was not filed in bad faith. *Compare United Stanford Employees, Local 680 v. NLRB,* 601 F.2d 980, 982–83 (9th Cir.1979) (union commits unfair labor practice by bringing suit against employee which did and "was intended to" restrain employee in the exercise of his section 7 right not to join the Union) *with Bergman v. NLRB,* 577 F.2d 100, 103–04 (9th Cir. 1978) (union commits no unfair labor practice by bringing suit against employee where no indication that union acted other than in "good faith" to enforce facially valid and binding labor agreement) *and Lodges 743 & 1746, IAMAW v. United Aircraft Corp.,* 534 F.2d 422, 464–65 (2d Cir. 1975) (union commits no unfair labor practice by bringing suit where no showing of malicious prosecution or abuse of process), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976).[12] We find these contentions equally unpersuasive.

We have no difficulty in agreeing with the Board that a $30,000 state court suit is likely to discourage an employee from bringing charges before the Board, since a union member faced with such a suit must defend himself in the state court action with all the attendant monetary cost, anxiety, and loss of time while continuing to press charges before the Board. *Bill Johnson's Restaurants, Inc. v. NLRB,* 103 S.Ct.

at 2169; *see Linn v. Plant Guard Workers,* 383 U.S. 53, 64, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966). A lawsuit such as the one brought against Gilson not only sends a clear message to the member sued to drop the charges filed before the Board, but also implicitly warns other members of the union that if they are to file charges against the union they too will find themselves in court. *Bill Johnson's,* 103 S.Ct. at 2169. Finally, the chilling effect of a state lawsuit upon an employee's willingness to file charges before the Board is multiplied where the state court complaint seeks damages. *Id.* Where, as here, a state court suit is filed against "individuals who lack the backing of a union, the need to allow the Board to intervene and provide a remedy is at its greatest." *Id.*

We next address the Board's finding that the suit was filed in bad faith. Questions of subjective motivation are questions of fact to be decided by the Board, and the Board's finding must stand if supported by substantial evidence on the record as a whole. *Hambre Hombre Enterprises, Inc. v. NLRB,* 581 F.2d 204, 207 (9th Cir.1978) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)); *Shattuck Denn Mining Corp. v. NLRB,* 362 F.2d 466, 470 (9th Cir.1966).

The Board's finding of retaliatory motivation is supported by substantial evidence.[13] The fact that the suit was filed

"in bad faith" when it files a lawsuit for the predominant purpose of retaliating against an employee or restraining him from exercising rights protected under the Act. Even an action not taken "in bad faith," however, may naturally tend to coerce or to restrain an employee from the exercise of protected rights. Thus, the expected effect of the action taken by a union, that is, whether the action tends to coerce or restrain an employee, is not conclusive on the issue of the union's motive. *See Associated Gen. Contractors v. NLRB,* 637 F.2d 556, 561–62 (8th Cir.1980) (discussing cases).

**12.** *See also Bill Johnson's Restaurants, Inc. v. NLRB,* 660 F.2d 1335, 1342 (9th Cir.1982) (employer commits unfair labor practice where suit filed in bad faith *and* in furtherance of an unlawful objective), *rev'd on other grounds,* ——

U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983); *Associated Gen. Contractors v. NLRB,* 637 F.2d 556, 560–62 (8th Cir.1980) (employer's association did not commit unfair labor practice by bringing suit which was *not* "designed" to interfere with the exercise of guaranteed rights).

**13.** There is substantial evidence in the record to support the Board's conclusion that the Union's state court suit was instituted by the Union primarily in "bad faith" in an attempt to retaliate against Gilson for or to restrain Gilson from bringing his charge before the Board. Thus, we need not decide here whether the bringing of a suit which restrains employees in the exercise of § 7 rights can constitute an unfair labor practice under § 8(b)(1)(A) where the suit is not brought in "bad faith." *See*

within a few weeks after the General Counsel had issued a complaint against the Union in response to Gilson's charges is some evidence that the Union primarily intended the lawsuit as a retaliatory or coercive measure. Even more suggestive of a retaliatory motive is the fact that the Union sought $30,000 in compensation for unspecified damages allegedly resulting from Gilson's "conduct." The only "conduct" mentioned in the Union's state court complaint was Gilson's assertion before the Board that the Union had breached its fiduciary duty to him by procuring his discharge.

The Union's repeated explanation of the suit as an attempt to "preempt the choice of forum" to litigate the controversy over Gilson's discharge is further evidence that the Union thereby sought to deter Gilson from pressing the unfair labor practice charge before the Board. The record before the Board is devoid of evidence that would lend support to the Union's claim that the suit was *not* intended predominantly to retaliate against Gilson for bringing his charge before the Board or to restrain him from pursuing that charge, but rather largely to remedy some wrong done to the Union by Gilson's filing of the charge. In the absence of such evidence, there is no basis on which this court may conclude that the Board's factual finding that the Union initiated the state court lawsuit with a retaliatory motivation was error.

The Union argues finally that, even if its conduct would otherwise be an unfair labor practice under section 8(b)(1)(A), it has an absolute right to litigate in state court the question of whether the Union breached its duty of fair representation by causing Gilson's discharge. The Union urges that

*Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), holds that state and federal courts have concurrent jurisdiction with the Board, in all fair representation cases. Accordingly, the Union could seek in state court a declaration that it had not given Gilson an extension and that it therefore had not violated its duty. We find this argument unpersuasive.

First, since *Vaca* itself was rendered on facts substantially different from those before us in this case, it does not readily support the Union's contention. In *Vaca,* the Court upheld the jurisdiction of the Missouri courts over a civil suit brought by an employee against a union alleging the union's breach of its duty of fair representation. 386 U.S. at 188, 87 S.Ct. at 915. In determining that the Board's power to adjudicate such a dispute under its unfair labor practice jurisdiction did not "preempt" the jurisdiction of state courts, the Court found critical the possibility that the "unreviewable discretion" of the Board "to refuse to institute an unfair labor practice complaint," in the absence of jurisdiction of the state courts over such controversies, could prevent an individual from securing redress for arbitrary union conduct. 386 U.S. at 182–83, 87 S.Ct. at 912–13. Here, by contrast, the union member, himself, prior to the initiation of the Union's state court suit, had filed a section 8(b)(2) unfair labor practice charge before the Board, a charge whose substance it is conceded was precisely the same as that of the claim which the union sought to have decided in state court.[14] Even if we were to assume that the policy considerations in favor of ensuring the ability of an employee to se-

---

Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 424, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968) ("[a]ny coercion used to discourage, retard or defeat" any employee's access to the Board is beyond the legitimate interests of a labor organization); *Bill Johnson's Restaurants, Inc. v. NLRB,* 660 F.2d 1335, 1342 n. 1 (9th Cir.1982) (questioning necessity of, but nonetheless finding existence of, "bad faith" as "key" element of unfair labor practice of employer under § 8(a)(1)), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983); *United Stanford Em-*

ployees, Local 680 v. NLRB, 601 F.2d 980, 983 (9th Cir.1979) (dictum) (bad faith of union in bringing of lawsuit is not element of unfair labor practice under § 8(b)(1)(A)).

14. Whether the controversy be styled an unfair labor practice charge by Gilson or a breach of duty of fair representation claim by the Union, the crucial issue for resolution in each dispute is the same: whether Gilson was discharged upon the request of the Union despite Gilson's securing of an extension of time for payment of dues.

cure redress for a grievance against a union are as strong as those in favor of ensuring a union's ability to seek a determination of a claim that may potentially be brought against it, those concerns certainly do not run in favor of upholding the concurrent jurisdiction of the state courts over a controversy that is already before the Board and, by virtue of the Board's issuance of a complaint, will be fully and fairly adjudicated in that forum. We decline the Union's invitation to so read *Vaca.*

■ To adopt the Union's position would also be inconsistent with the Court's most recent explication of the Board's jurisdiction, which emphasizes that the Board as a general matter is to have primary jurisdiction over controversies involving activity that may be prohibited by section 8 of the Act. *See Sears, Roebuck & Co. v. San Diego Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). In *Sears,* the Court reemphasized the fundamental principles of Board preemption established in *San Diego Building Trades v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). It stated that a labor-related controversy may legitimately be heard in state court only where the controversy could not have been presented to the Board, or although within the Board's jurisdiction, "the party who could have presented the ... issue to the Board has not done so and the other party to the dispute has no acceptable means of doing so." *See Sears,* 436 U.S. at 197, 202–203, 98 S.Ct. at 1757, 1760–1761; *see Garmon,* 359 U.S. at 244–45, 79 S.Ct. at 779–80. The Court listed several examples of conduct that is so "deeply rooted in local feeling and responsibility" that state court jurisdiction must be deemed to survive the conferral of jurisdiction on the Board under the Act. 436 U.S. at 195, 98 S.Ct. at 1756. Yet the Court failed to mention duty of fair representation claims as such a fundamentally "local" variety of dispute. *Id.* Thus, even if dictum in *Vaca* does support an unrestricted right of a union to litigate a duty of fair representation question in state court, which we doubt, that aspect of *Vaca* has been cast aside *sub silentio* by *Sears.* We conclude therefore that absent a showing that the state court suit was intended to adjudicate a controversy between the Union and the employee that is at least in part separate from the controversy before the Board, that the Board itself had no power to adjudicate the subject matter of the state court suit, or that the Union had no ability to bring the controversy to decision before the Board, *Vaca,* as viewed through the filter of *Sears,* imposes no barrier to treating a union's prosecution of a state court action as an unfair labor practice. *See United States Credit Bureau of America v. NLRB,* 643 F.2d 1017, 1026 (4th Cir.1981) (employer's bad faith filing of state court suit based on employee's alleged abuse of Board's processes treated as unfair labor practice, where the "same controversy" was already before the Board).

In this case, the controversy underlying the Union's state court suit was in fact already before the Board, was within the Board's unfair labor practice jurisdiction, and was being actively pursued. Accordingly, nothing in *Vaca* prevents the Board's conclusion that the Union's filing of the state court action was an unfair labor practice under section 8(b)(1)(A).

■ While none of the Union's arguments lead us to conclude that the filing of the state court suit was not an unfair labor practice, the recent Supreme Court case of *Bill Johnson's Restaurants, Inc. v. NLRB,* — U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), requires us to deny enforcement of the portion of the Board's order enjoining further prosecution of the state court suit.

■ Under *Bill Johnson's,* a conclusion that a union's state court lawsuit both was intended to restrain and has the likely effect of restraining employees in the exercise of protected activities is not by itself an adequate basis to enjoin prosecution of the suit. The Board must further determine that the lawsuit lacks any "reasonable basis." 103 S.Ct. at 2173. If the state court suit has any possible reasonable basis, the Board has no power to enjoin the prosecu-

tion of the union's claim in state court. *Id.* The Supreme Court explicitly defined the narrow inquiry which the Board may make about a suit which a state court has entertained:

> The Board's reasonable basis inquiry must be structured in a manner that will preserve the state plaintiff's right to have a state court jury or judge resolve genuine material factual or state-law legal disputes pertaining to the lawsuit. Therefore, if the Board is called upon to determine whether a suit is unlawful prior to the time that the state court renders final judgment, and if the state court plaintiff can show that such genuine material factual or legal issues exist, the Board must await the results of the state-court adjudication with respect to the merits of the state suit.

*Id.* Although the Board "need not be limited to the bare pleadings" when it makes the inquiry, it may not enjoin the suit "if there is a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts." *Id.* 103 S.Ct. at 2171.

"[W]eighty countervailing considerations" operate to restrain the Board's injunction against a state court suit when there are genuine material factual or legal issues. *Id.* 103 S.Ct. at 2169. Justice White explained in *Bill Johnson's:*

> When a suit presents genuine factual issues, the state plaintiff's First Amendment interest in petitioning the state court for redress of his grievance, his interest in having the factual dispute resolved by a jury, and the State's interest in protecting the health and welfare of its citizens, lead us to construe the Act as not permitting the Board to usurp the traditional fact-finding function of the state court jury or judge.... [The Board] likewise must not deprive a litigant of his right to have genuine state-law legal questions decided by the state judiciary.

*Id.* 103 S.Ct. at 2171–72. The limitation these considerations impose on the Board's power was specially emphasized in Justice Brennan's concurring opinion:

> The most reasonable inference to draw from the structure of state-federal relations in this area is that the Board may enjoin prosecution of a state lawsuit if, in addition to whatever other findings are required to decide that an unfair labor practice has been committed, it determines that controlling federal law bars the plaintiff's right to relief, that clear state law makes the case frivolous, or that no reasonable jury could make the findings of fact in favor of the plaintiff that are necessary under applicable law. I can understand the phrase "genuine material disputes," * * * no other way.

*Id.* 103 S.Ct. at 2176 (Brennan, J., concurring).

While we could legitimately be concerned by the implications of a rule that might permit a respondent to avoid or delay unfair labor practice charges by the device of filing groundless lawsuits, the Board is not without means of protecting the integrity of its mission. It "need not stay its hand if the plaintiff's position is plainly foreclosed as a matter of law or is otherwise frivolous." *Bill Johnson's,* 103 S.Ct. at 2172. A suit which raises no genuine issue will not sidetrack the Board. But the agency may not, in the face of contested genuine issues of material fact or law, prevent the state court's exercise of its jurisdiction.

In this case, the Board did not consider the baselessness of the Union's state court complaint before concluding that the Union had committed an unfair labor practice by filing the suit. Consequently, we deny enforcement to the Board's injunction and order to reimburse legal expenses and remand the case to the Board for further proceedings.

Upon remand, the Board must determine whether the Union could conceivably prevail against Gilson on the basis of defamation or any other theory of liability under California law.[15] If the Board deter-

---

**15.** On remand, unless California law leaves no room for argument, the Board should not con-

mines that the Union's state lawsuit presents no genuine issue of material fact or is plainly foreclosed as a matter of California law, it may reinstate its injunction against prosecution of the state court action.[16]  *Bill Johnson's,* 103 S.Ct. at 2171. However, if it cannot make such a finding, it must hold the section 8(b)(1)(A) unfair labor practice charge in abeyance pending the outcome of the state court action. *Id.* 103 S.Ct. at 2170. If the state court rules against Gilson, the section 8(b)(1)(A) charge must then be dismissed. *Id.* 103 S.Ct. at 2172. If, however, the state court rules against the Union, the Board is free, as *Bill Johnson's* makes clear, to order the Union to reimburse its member for state court legal fees and to order other appropriate relief. *See id.* 103 S.Ct. at 2172–73.

## CONCLUSION

We enforce that portion of the Board's order relating to back pay. We deny enforcement to that portion of the Board's order granting an injunction and reimbursement for legal expenses and remand for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.

POOLE, Circuit Judge, concurring and dissenting.

I concur in the majority's conclusion that the order of the National Labor Relations Board (NLRB) enjoining the Union's state-court lawsuit is quite unenforceable. I dis-

sent from the rest of the majority's determinations because they are all foreclosed by the decision of the Supreme Court in *Bill Johnson's Restaurants, Inc. v. NLRB,* —— U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (*Bill Johnson's II*). That decision has held that where a state-court lawsuit has been filed which is not baseless (i.e., not frivolous or lacking any reasonably litigable issue of law or fact), the Board cannot enjoin its prosecution. Moreover, under such circumstances, the Board cannot continue *its* own proceeding if it necessarily involves determining that same issue of which the state-court has acquired proper jurisdiction. Therefore, we have no business deciding corollary and derivative issues which cannot be reached until the lawsuit is decided.

The dispositive issue before the state-court and before the Board is a disputed fact question: Did the Union give its member an oral extension of time in which to pay his dues? It can only be resolved by a proceeding in which credibility is resolved. Neither the majority nor the Board contends that that issue is not in dispute, or that the dispute is not genuine. The majority has devised a theory that the Board acquired jurisdiction before the Union filed in state-court and that that ousts the court of jurisdiction. That is completely without substance. The majority also says that the Administrative Law Judge already has decided the fact issue against the Union, and that is that. My answer is the suggestion that *Bill Johnson's II* be reread.

sider the collateral estoppel effect on the state court action of the Board's fact-finding or the possibility that Gilson's charges before the Board are privileged under California law. It may well be that, under California law, the Union will be collaterally estopped from contesting the facts found by the ALJ in deciding the § 8(b)(2) charge. It may also be that under state law there is an absolute or qualified privilege for anything Gilson asserted in bringing his unfair labor practice complaint before the Board. In *Bill Johnson's,* however, the Supreme Court made it clear that the state court plaintiff is entitled to a ruling by the state court on any genuine state law legal questions. *See* 103 S.Ct. at 2172.

**16.** The Board would also be free to enjoin the state court action if it concludes, on remand, that the recovery of damages by a Union from an employee under the facts as alleged by the Union is nonetheless illegal under federal law or that the state lawsuit is entirely beyond the jurisdiction of the state court because of federal law preemption. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 103 S.Ct. at 2167 n. 5; *id.* 103 S.Ct. at 2176 (Brennan, J., concurring) (no "genuine material dispute" where "controlling federal law bars the plaintiff's right to relief" in state court); *accord Linn v. Plant Guard Workers,* 383 U.S. 53, 64–65, 86 S.Ct. 657, 663–664, 15 L.Ed.2d 582 (1966) (federal law imposes a malice requirement in libel disputes involving certain "labor debate").

At heart in the Supreme Court's decision which reversed a precedent of this circuit (to which the majority still clings), is the philosophy that the judicial power in this society is in a dual system of courts, federal and state, each with its own integrity of structure and functioning. No part of that power is committed to administrative agencies. Although in its work of implementation of the National Labor Relations Act (the Act), Congress has given to the Board a mission and the means of discharging its responsibilities, those means include no authority to perform the judicial function nor the power to interfere with activities which are legitimately within the judicial function. When a court of the states has invoked a proper jurisdiction to hear and determine an issue, the message of *Bill Johnson's Restaurants, Inc. v. NLRB,* —— U.S. ——, 103 S.Ct. 2161, 76 L.Ed.2d 277 (*Bill Johnson's II*), is that the Board must stay its hand because our jurisprudence demands that kind of deference to a court.

This is not new ground. The principle has been recognized in many circumstances. That is what *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) holds. That is why even federal courts must sometimes stay their process, as in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), when a state-court is considering an issue of great state concern. Important and valued principles are entrusted to the expertise of administrative bodies, such as the Board, and their exercise of statutory authority is not legally subject to interference except in accordance with established principles. But other and more paramount considerations come into play when administrative adjudicatory functioning conflicts with judicial functioning with respect to the same subject matter. Even carefully designed statutory schemes relating to administrative determinations may be held to have built-in exceptions when the administrative and the judicial power reach to the same issues. *See, e.g., Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 1891, 72 L.Ed.2d 262 (1982) (although Title VII cases are tried in federal district court *de novo* after consideration by a state

agency to which EEOC has deferred, "neither the statute, nor our decisions, indicate that the final judgment of a state-court is subject to redetermination at such a trial.").

*Bill Johnson's II* applies these principles to the field of labor law. It holds plainly that the Board cannot require an employer to withdraw a state-court lawsuit if it has any real substance. This does not imply any inquiry into whether the suit may in fact be won or lost. The Supreme Court cast it in terms of a genuine issue of fact—concepts having distinct meaning in litigation. The common sense of it is that if the lawsuit is a sham, then it is in effect no lawsuit. State courts have no defensible interests in allowing sham or baseless lawsuits to clutter their dockets. Justice Brennan, concurring in *Bill Johnson's II,* wrote that a suit is without reasonable basis if it appears that "controlling federal law bars the plaintiff's right to relief, that clear state law makes the case frivolous, or that no reasonable jury could make the findings of fact in favor of the plaintiff that are necessary under applicable law." *Id.,* 103 S.Ct. 2176. Under these circumstances the obligation of deference is overcome.

In this case, in no way can it be argued that the Union's state-court action is a sham. Its subject is very clear. One count sounds in libel and slander, claiming that the member falsely imputed unfair conduct to the Union in improperly causing his discharge. Unions are entrusted with looking after the interests of their members. Procuring a member's discharge without reason and contrary to the Union's fiduciary responsibilities could certainly constitute libel or slander.

In our case, the Union caused Gilson's discharge. If there was just cause—delinquency in payment of union dues—the Union's action was valid under the express terms of the Act and of the collective bargaining contract. If there was no just cause, the Union would, exactly as Gilson and the Board charged, have committed an inexcusable breach of the fiduciary's duty owed to its member. Such a charge, if false, could be viewed as slander because it

tends directly to injure [it] in respect to [its] office, * * * trade or business, either by imputing to [it] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to [its] office, * * * trade, or business that has a natural tendency to lessen its profits; * * *

California Civil Code, § 46(3). It could also constitute libel:

Libel is a false and unprivileged publication by writing, printing, * * * which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which as a tendency to injure him in his occupation.

California Civil Code, § 45.

Truth, of course, is one of the most common defenses. *Royer v. Steinberg,* 90 Cal. App.3d 490, 153 Cal.Rptr. 499 (1979). The Union denied it had given Gilson an extension. Unless the extension was established, Gilson had no case and the Board had no case. It was Gilson's word against that of the Union's people. There was no smoking gun, only a credibility determination to be made on conflicting testimony. The element or defense of "truth" is critical and cannot be proved without first resolving that oral conflict. The administrative law judge did resolve the conflict in Gilson's favor, but that issue was also before the state court in the lawsuit. *Bill Johnson's II* holds that the ALJ was wrong in deciding the same issue because it was court litigation, and preclusive effect should have been accorded that litigation.

Justice White wrote:

As noted above, the ALJ had no reservations about weighing the evidence and making credibility judgments. Based on his own evaluation of the evidence, he concluded that the libel count in petitioner's suit lacked merit, because the statements in the leaflet were true, and that the business interference counts were groundless, because the evidence failed to support petitioner's factual allegations. [Citations omitted]. *It was not the ALJ's province to make such determinations.*

What he should have determined is not whether the statements in the leaflets were true, but whether they were knowingly false. Similarly, he should not have decided the facts regarding the business interference counts; rather, he should have limited his inquiry to the question whether petitioner's evidence raised factual issues that were genuine and material. (Emphasis added).

*Id.,* 103 S.Ct. 2173.

On the facts of this case there simply is no way, consistent with the Supreme Court's holding, that the Board or ALJ can conclude that the Union's state-court suit fails to raise a genuine issue of fact. That issue is to be determined by the court—not by the administrative agency. The ALJ can look at the state case but *only* to see that it is for real. Once that reality is seen to exist, "the Board must await the results of the state-court adjudication with respect to the merits of the state suit." *Id.* It cannot itself weigh and decide an issue which is not, in effect a sham.

Since, in this case, the ALJ is not entitled to consider and make credibility determinations on disputed testimony (I would assume all would agree that there was no inherent incredibility on either side), the agency's duty was and now is to await the outcome of the state lawsuit because the verbal extension is the linchpin of the entire unfair labor practice proceeding. For this reason, the majority ought not to have rushed into a decision whether section 7 rights are involved because it does not know whether that issue will survive. If the Union should prevail in the state-court, that issue will disappear. If the Union loses its lawsuit, then and only then will the way be open for Board action. The majority, too, should stay its hand.

The majority's opinion is replete with dictum, including the unfounded statement that the principle of state-court deference does not apply if NLRB proceedings were already underway when the action was filed. At 1263. This is incorrect. In *Bill Johnson's II,* Board proceedings were already ongoing. The Supreme Court did not

say it was too late. It said that at that point the "Board should proceed no further with its * * * unfair labor proceedings but should stay those proceedings until the state-court suit has been concluded." *Id.* 103 S.Ct. at 2171–2172.

The majority is also wrong in holding that the Board is not required to hold up its action, even though a state-court suit clearly presents a genuine issue for decision, unless it appears that the state-court suit involves "a controversy that is at least in part separate from the controversy that before the Board, that the Board itself had no power to adjudicate the subject matter of the state-court suit, or that the Union had no ability to bring the controversy to decision before the Board * * * " At 1263. This is entirely inconsistent with *Bill Johnson's II* and I find it difficult to believe the majority really adheres to any such analysis.

Turning to other issues which the majority has with some gratuitous industry discussed, I would ask why, if the Board is to stay its hand—and I have no doubt that it must do so—do we undertake to decide the summary judgment and section 7 issues—issues which may never again arise in this case—and which in the present posture of the case do not represent final agency action?

I would remand to the Board for the sole purpose of letting it make its cautious and limited analysis whether there exists a genuine issue for the state-court to hear. The Board has no business guessing the actual outcome if such an issue exists. In my judgment it would be a capricious act should the Board find no genuine issue. And this court has no business doing prejudging either.

For these reasons I dissent.